Thomas Machine Manufacturing Company v. Commissioner.
Thomas Machine Mfg. Co. v. Commissioner
Docket No. 91035.
United States Tax Court
T.C. Memo 1964-269; 1964 Tax Ct. Memo LEXIS 70; 23 T.C.M. (CCH) 1630; T.C.M. (RIA) 64269; October 12, 1964
*70 Petitioner corporation acquired certain assets from its principal officer and controlling stockholder, George P. Thomas, Sr., in 1942 pursuant to a conditional sales contract under the terms of which the consideration of $75,000, plus four percent annual interest, was to be paid in 15 annual installments. From the time of the alleged purchase of said assets to 1957, inclusive, the taxable year involved herein, petitioner paid Thomas so-called interest every year, but paid only $10,000 on the principal. Petitioner paid its other corporate obligations and also paid yearly dividends since 1951. During the period involved, petitioner had sufficient funds and could have made principal payments required in said contract. 1. Held: Amount paid as "interest" to Thomas by petitioner in 1957 was not interest paid on indebtedness within the purview of sec. 163, I.R.C. 1954. 2. Held: Compensation paid by petitioner to each of three executives during 1957 was reasonable within the meaning of sec. 162, I.R.C. 1954. Sidney B. Gambill and Joseph G. Robinson, 747 Union Trust Bldg., Pittsburgh, Pa., for the petitioner. Lawrence L. Wilson, for the respondent. FISHER
Memorandum Findings of Fact and *71 Opinion FISHER, Judge: Respondent determined a deficiency in the income tax of petitioner for the taxable year 1957 in the amount of $16,395.42. The issues presented for our consideration are: (1) Whether $2,600 paid by petitioner to George P. Thomas in the taxable year 1957 constituted payment of interest on indebtedness of petitioner under section 163, Code of 1954; [1] and (2) whether compensation paid by petitioner to its officers in 1957 constituted reasonable compensation for services rendered to petitioner by such officers under section 162, Code of 1954. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioner, a corporation, was organized in 1917 under the name of Thomas Spacing Machine Company and, since that time, has been engaged in the business of machine work and manufacture of machinery and machine tools at its plant located at Glenshaw, Pennsylvania. The corporate name was changed to Thomas Machine Manufacturing Company during 1937. Petitioner was incorporated with an authorized capital stock of $350,000 represented by 3,500 shares of common stock *72 having a par value of $100 per share. Upon its incorporation petitioner issued 3,224 shares of the authorized stock for property with a value of $125,000, and cash of $197,400. The 3,224 shares have been outstanding since the petitioner was incorporated, except that in 1956 there was a stock dividend of one share for each share outstanding. At all times petitioner has kept its books and records and filed its tax returns on an accrual method of accounting. Petitioner's income tax return for the taxable year ended December 31, 1957, was timely filed with the district director of internal revenue, at Pittsburgh, Pennsylvania. The notice of deficiency for 1957 was mailed to petitioner on December 23, 1960. George P. Thomas (hereinafter sometimes referred to as Thomas) has been the president and chairman of the board of directors of petitioner since its organization in 1917, and at all times relevant herein has made the final decisions on all matters of policy and administration affecting petitioner. Throughout the years the petitioner has been engaged in the manufacture of machinery and machine tools and in doing machine work. Its primary business has been the designing and building of *73 metal working machinery used principally by structural fabricating plants in the United States and in foreign countries. The machines are built in various sizes for different purposes. The most important machine built by petitioner is a punching machine used for punching holes in steel structural plates such as steel beams and angles. Several years ago Thomas developed an "automatic spacing table," a machine or device that pulls the structural beams and angles under a punching machine and automatically spaces the rivet holes in accordance with drawings without marking the member to be punched. Later he improved this machine to the extent that the petitioner at the time of the instant proceeding was building a model which is numerically controlled. Prior to the development of the Thomas spacing machine it was necessary for a "layer-out" man to read the drawings and place the mark on each beam for each rivet hole. The beam was taken to a punching machine and each hole was punched separately. The machine developed by Thomas did all of this automatically, punching multiple holes. The machines and improvements developed by Thomas were patented by him and were made available to petitioner *74 without compensation. Ordinarily machines built by the petitioner are built from specifications furnished by its customers. It usually requires from 60 to 90 days to build a machine. The prices of said machines are as high as $200,000. Petitioner also builds a regular line of fabricating machines from its own detailed drawings, modified to meet the requirements of the customers. Prices of said machines vary from $5,000 to $125,000. For several years prior and subsequent to 1920, Thomas operated a sole proprietorship under the name "Thomas Company" engaged in buying and selling used industrial machinery. Thomas, acting individually, between the time the petitioner was incorporated and 1920, purchased 13 large machines and a 15-ton overhead traveling crane. Prior to January 15, 1936, said machinery was leased by Thomas to the petitioner by a series of leasing agreements. Petitioner paid rent to Thomas for the use of the machinery. On January 15, 1936, Thomas was the holder of six percent first mortgage bonds of the petitioner in the amount of $54,000. Prior to January 15, 1936, petitioner made an application to the Reconstruction Finance Corporation (hereinafter referred to as RFC) for *75 a loan. A loan of $144,800 was approved by the RFC on January 17, 1936. Said loan was secured by a first mortgage on the real estate, plant, machinery, and equipment of the petitioner, and was conditioned upon an agreement of Thomas to postpone the enforcement of his rights to the payment of the principal and interest on the aforesaid first mortgage bonds in the amount of $54,000 held by him until the RFC was paid. Such an agreement was executed by Thomas. Another condition to the RFC loan was that Thomas would transfer to petitioner the 13 machines and crane which he was leasing to the petitioner and which were installed in petitioner's plant. The loan was guaranteed by Thomas and was to be repaid over a period of five years. Said loan was fully satisfied on December 29, 1941. In compliance with the conditions of the RFC loan, petitioner, Thomas, and Citizens Deposit and Trust Company of Pennsylvania, Trustee, made an agreement whereby Thomas postponed all rights to principal and interest on petitioner's six percent mortgage bonds held by him during the existence of the RFC loan. Citizens Deposit and Trust Company, as trustee, was the holder of a mortgage of petitioner to secure petitioner's *76 bonds. In compliance with conditions of the RFC loan, Thomas agreed to convey by bill of sale to petitioner for the sum of $99,273 the 14 items of machinery which were being leased from Thomas. Petitioner agreed to pay $99,273 to Thomas when the RFC loan was satisfied and also agreed to pay Thomas $1,500 per year as interest until the purchase price was paid, such amount being the maximum allowed by the RFC to be paid. On January 15, 1936, Thomas gave petitioner a bill of sale for the machines and received petitioner's note for $99,273. The amount of $99,273, stated as the purchase price, was based upon an appraisal of the machines made in 1934 by the Manufacturers' Appraisal Company, but such appraisal did not include a 15-ton Cleveland Overhead Crane included as one of the 14 items of machinery transferred by Thomas. On January 15, 1936, petitioner and Thomas made an agreement that upon full satisfaction of the RFC loan, petitioner would reassign the machinery to Thomas, and the note for $99,273 would be cancelled. The transfer of the machinery from Thomas to petitioner on January 15, 1936, was not intended by the parties to the transaction as a bona fide sale. In 1936 petitioner's *77 books contained an account labeled "Accrued Machinery Rent - George P. Thomas," and an account labeled "Deferred Liability on Machinery Assigned from George P. Thomas." Accruals of machinery rent were made in the former account up to December 13, 1942, based upon six percent per year of the balance of the latter account. The balance of such latter account was $99,273 until June 30, 1941, when it was reduced by $2,639.25 to $96,633.75 to reflect an adjustment created by a sale of a machine described as a Newton Cold Saw during April 1940. Although petitioner was precluded from paying principal or interest to Thomas on its bonds during the period the RFC loan was unsatisfied, petitioner accrued interest to Thomas at the rate of six percent on such bonds during such period and during 1942. As of December 13, 1938, and December 31, 1941, the following denominated accounts on the books and records of the taxpayer had the following balances: 12-31-38
12-31-41
Bonds outstanding (253)
$45,000.00
$45,000.00
Accrued interest on bonds
- George P. Thomas,
owner of bonds (13)
11,400.00
19,500.00
Deferred liability on ma-
chinery assigned from
George P. Thomas * *78 (251A)
99,273.00
96,633.75
Accrued machinery rent -
George P. Thomas (262A)
20,778.04
32,636.26
Notes payable - G. P.
Thomas (252D)
3,185.23
3,185.23
Accrued interest - G. P.
Thomas note (262B)
971.53
1,497.02
Accounts Rec. - Thomas
Co. (7)
2,982.69
2,982.69 On March 1, 1942, petitioner gave Thomas a note in the amount of $6,908.06 which covered accrued interest on bonds and notes and accrued machinery rent, all for the year 1941. The note was paid December 31, 1942. During 1942 Thomas offered a plan for liquidation of amounts shown on the petitioner's books as being owed to him. The plan was outlined in the minutes of a directors' meeting held July 21, 1942. * * *
The detail of the items shown on the books of the Thomas Machine Manufacturing Company as due George P. Thomas, Sr. at December 31, 1941 follows: Bonds outstanding
$ 45,000.00
Note payable
3,185.23
Account payable
781.12
Due for machinery
96,633.75
Accrued interest on bonds
19,500.00
Accrued machinery rental to
12-31-41 (net)
32,636.26
Interest accrued on note payable
to 12-31-41
1,497.02 * * *
$199,233.38
Mr. Thomas is willing to accept the following offer for liquidation *79 of the companies indebtedness to him in the amount of $199,233.38 as listed in the second paragraph of this letter: (1) The company to pay in cash, as available, the following: Bonds outstanding
$45,000.00
Note payable (balance long out-
standing)
3,185.23
Account payable
781.12
$48,966.35
Add: Bond and note interest and
machinery rental
20,929.72
$69,896.07
Less: Accounts receivable (old
balances due from Geo. P.
Thomas, Sr. and the Thomas
Company)
2,982.69
Total cash payment
$66,913.38 (2) Mr. Thomas proposes to have the aforementioned sale of machinery agreement rescinded, thereby restoring title to him; (3) Mr. Thomas is aware of the fact that his machinery, which the company is presently using, is worth considerably more than the appraised value of $96,633.71, (which was made by the Manufacturers' Appraisal Company, and approved by the Reconstruction Finance Corporation), but he is willing to make a considerable reduction in the selling price, under the appraised value. Accordingly he proposes a conditional sales agreement in the amount of $75,000.00 for the sale of the machinery to the company. The agreement to cover a period of 15 years with interest at 4 per cent per annum on the unpaid balance; *80 first payment to be made in 1943. Summarizing the above proposal would result in the following adjustments: Total liability to George P.
Thomas, Sr.
$199,233.38
Deduct: Contra accounts receiv-
able due from George P.
Thomas, Sr.
2,982.69
$196,250.69
Amount to be paid in
cash as per Para-
graph (1)
$66,913.38
Sales of machinery un-
der conditional sales
agreement for
75,000.00
Reduction by Mr.
Thomas below ap-
praised value of ma-
chinery
21,633.75
Contribution to capi-
tal of company: For machin-
ery rental $20,778.07
Interest on
Bonds
11,400.00
Interest on
note (net)
525.49
32,703.56
$196,250.69
In the above arrangement, Mr. Thomas is reducing his claim against the company by the total sum of $54,337.31, by cutting the price on the machinery and his contribution to the company of a large portion of machinery rental and interest due him. * * *
George P. Thomas, Jr., was a member of the board of directors of petitioner during 1942. Prior to January 31, 1942, Thomas received $45,000 in retirement of petitioner's bonds held by him. On December 15, 1942, the note given to Thomas by petitioner on January 15, 1936, in the amount of $99,273, was cancelled. On the same day petitioner gave Thomas a bill of sale covering all *81 items of machinery (except the Newton Cold Saw) listed in the bill of sale which Thomas had given to petitioner on January 15, 1936. On December 15, 1942, Thomas, as seller, and petitioner, as buyer, signed a document labeled "Conditional Sales Agreement" providing for the sale to petitioner of the 13 items of machinery which on that day had been assigned to Thomas by bill of sale from petitioner. The sale price was stated as $75,000. The conditional sales agreement provided for principal payments to be made over a period of 15 years, the last payment to be made December 15, 1957. Interest was payable at four percent per year on the unpaid balance. In the case of any default of payment by the buyer or failure to perform in accordance with the covenants of the agreement, the balance of the purchase price immediately became due, and, if not paid, the seller could repossess the property or obtain confession of judgment for any amount due and payable, including the full unpaid balance of the purchase price. A covenant of said agreement provided that the buyer was not to sell, encumber, assign, or dispose of the chattels. On December 15, 1942, the 13 items of machinery referred to in the *82 conditional sales agreement were worth considerably more than $96,633.71. In 1963, 9 of the 13 machines were still at petitioner's plant and were appraised at $109,065. Petitioner's books contain the following journal entry dated December 31, 1942. Dr. George P. Thomas -
Accrued interest on notes
to 12-31-38 - 262B
$ 923.69
Dr. George P. Thomas -
Accrued machinery rent-
al to 12-31-38 - 262A
20,778.07
Dr. Accrued interest on
bonds 13
11,400.00
Cr. Capital Surplus - do-
nated - 266A
$28,417.19
Cr. Accounts Rec. G. P.
Thomas, Sr. - 7
1,701.88
Cr. Accounts Rec. Thomas
Co. - 7
2,982.69
To cancel liability to George P. Thomas, Sr.
for accrued machinery rental, interest on bonds,
and notes to 12-31-38 and accounts receivable
from George P. Thomas, Sr. as per minutes of
Board of Directors held 8-4-42. On September 30, and December 28, 1942, the amounts of $25,000 and $20,000, respectively, were paid to Thomas by the taxpayer to retire its bonds held by Thomas. On December 31, 1942, Thomas received $6,908.06 from the taxpayer and the books and records of the taxpayer show that such amount retired a note to Thomas dated March 1, 1942, of an even amount. On June 30, 1943, Thomas received $7,929.42 from the taxpayer *83 and books and records of the taxpayer show that such amount retired a note to Thomas dated December 31, 1942, of an even amount. On the dates indicated the following amounts were paid to Thomas by the taxpayer: Amount
Paid
$ 500
July 2, 1943
4,500
Feb. 2, 1944
5,000
Feb. 28, 1945
5,000
Jan. 31, 1961
5,000
Jan. 31, 1962 The books and records of the taxpayer show that such amounts were entered and reduced accounts which refer to deferred liability pursuant to the document demoninated "Conditional Sales Agreement." The books and records of the taxpayer show the following amounts paid to Thomas by the taxpayer on the dates indicated: Date
Amount
December 30, 1943
$3,362.22
December 27, 1944
2,812.28
March 21, 1946
2,633.40
February 24, 1947
2,600.00
March 1, 1948
2,600.00
January 12, 1949
2,600.00
January 3, 1950
2,600.00
December 1950
$2,600.00
December 1951
2,600.00
December 1952
2,600.00
March 1954
2,600.00
March 1955
2,600.00
January 1956
2,600.00
January 1957
2,600.00
December 1958
2,600.00
December 1959
2,600.00
December 1960
2,600.00
December 1961
2,416.67 Such amounts have been claimed by the taxpayer on its Federal corporate income tax returns as deductions for interest paid, and the amount of $2,600 paid in January 1957 is *84 the amount in issue here, which was claimed by the taxpayer on its 1957 Federal corporate income tax return (Form 1120) as a deduction for interest paid. As of December 31, 1942, petitioner's books showed as owing to Thomas $7,841.24 for accrued machinery rent and $5,400 for accrued bond interest. The books also showed a note payable to Thomas for $3,185.23. The amounts of accrued machinery rental and accrued bond interest shown on petitioner's books on December 31, 1942, were carried as payables to Thomas on petitioner's books to the year 1957 and represented accruals for the years 1939 and 1940. Depreciation on the machinery referred to in the conditional sales agreement was claimed by Thomas for years prior to 1942 and for the period January 1, to December 15, 1942. In his individual Federal income tax return for the year 1942, Thomas showed this machinery purchased prior to the year 1920 at a cost of $45,000 with $37,369.55 of depreciation having been taken, and unrecovered cost basis to him of $7,630.55, and an estimated remaining useful life of six and one-half years. Petitioner, on its 1942 corporate income tax return, deducted depreciation on the machinery computed at 16 percent *85 per year of $75,000. Petitioner paid $10,000 to Thomas through February 28, 1945, and this amount was applied by petitioner to reduce a deferred liability account placed on petitioner's books by reason of the conditional sales agreement. The next payment claimed as a payment of principal to Thomas was not made until January 31, 1961. Petitioner paid annual amounts to Thomas based upon four percent of the balance of the deferred liability account placed on petitioner's books by reason of the conditional sales agreement and deducted such amounts on its corporate income tax returns as interest paid. The amounts paid through the years 1957 and 1961 total $37,807.90 and $45,024.67, respectively. The amount of $2,600, paid in January 1957, is the amount which was disallowed as a deduction on petitioner's 1957 income tax return. Except for items classified as current liabilities, the year-end balance sheets of petitioner for the years 1949 through 1961 reflect as debt only amounts shown as owed to Thomas. In November 1948, Thomas advanced $10,000 to petitioner and was repaid in December 1948. In April 1949, Thomas advanced $10,000 to petitioner and was repaid in May 1949. Petitioner's balance *86 sheets for the years 1945 through 1961 show that at no time did petitioner have a year-end cash balance of less than $13,548.90, or a combined amount of cash and receivables of less than $62,015.06. The cash position of petitioner as shown by its year-end balance sheets for the years 1945 through 1961, computed by subtracting from cash and current receivables all payables of whatever description including all reserves for potential liabilities but exclusive of amounts reflected as owing to Thomas, is as follows: 1945
$ 55,736.54
1954
$151,825.31
1946
(116,193.65)
1955
267,168.78
1947
( 74,572.84)
1956
157,980.31
1948
48,616.74
1957
229,047.99
1949
70,982.10
1958
281,576.88
1950
117,825.33
1959
263,117.92
1951
85,741.54
1960
239,351.09
1952
124,258.98
1961
292,965.60
1953
193,127.36
For the years 1945 through 1957, petitioner could have made installment payments to Thomas described in the conditional sales agreement. In May 1950, Thomas and petitioner made an agreement extending the expiration date of the conditional sales agreement for ten years from December 15, 1957, to December 15, 1967. Prior to May 1950, amounts designated as interest paid to Thomas totaled $19,207.90. At no time did Thomas make a demand on petitioner *87 for payment on the conditional sales agreement or take action to enforce payment under the provisions of the agreement. Net earnings (loss) after taxes and dividends paid by petitioner for the years 1945 through 1961 are as follows: Net earnings
(loss) after
Dividends
Year
taxes
Paid
1945
[10,777)
$ 3,224
1946
(23,571)
1947
24,770
1948
8,266
1949
(33,250)
1950
33,496
1951
42,343
12,090
1952
57,494
16,120
1953
46,385
19,344
1954
43,086
22,568
1955
56,704
22,568
1956
46,992
22,568
1957
75,989
22,568
1958
(11,312)
16,120
1959
(19,235)
16,120
1960
17,504
16,120
1961
14,870
16,120
The percentage of petitioner's stock owned by Thomas and relatives of Thomas consisting of Thomas's wife, children and spouses of children, was as follows: Percent-
Percentage
age owned
owned by
by relatives
Year
Thomas
of Thomas
Total
1936-1939
60.2
2.4
62.6
1940
60.2
1.5
61.7
1941
60.2
3.1
63.3
1942-1943
59.3
3.6
62.9
1944-1946
52.1
9.9
62.0
1947-1948
52.1
10.7
62.8
1949
52.1
10.8
62.9
1950
52.1
11.1
63.2
1951-1952
53.7
24.9
78.6
1953
53.7
26.1
79.8
1954-1955
53.7
27.7
81.4
1956-1957
51.8
29.9
81.7 Since 1957 there has been no change in the percentages of petitioner's stock owned by Thomas or those persons related to Thomas. The sale of the machinery and crane to petitioner and the promissory note issued therewith *88 in 1942 did not represent a bona fide indebtedness but in fact was a contribution of equity capital. In the notice of deficiency in tax to petitioner for the taxable year 1957, respondent disallowed a total of $18,563.22 claimed as compensation paid to petitioner's three officers consisting Thomas, George P. Thomas, Jr., and C. F. Wiley. The following schedule shows for each person the amount claimed by petitioner as compensation and the amounts allowed and disallowed by the respondent: Officer
Claimed
Allowed
Disallowed
George P. Thomas
$22,707.50
$16,375.00
$ 6,332.50
C. F. Wiley
15,265.36
8,725.00
6,540.36
George P. Thomas, Jr.
15,265.36
9,575.00
5,690.36
Total
$53,238.22
$34,675.00
$18,563.22
During the year 1957 Thomas was president of the petitioner and was 82 years of age. Since 1917 he has been the president and chairman of the board of directors of petitioner. Up until October 1962, when he suffered a physical breakdown, his physical and mental condition was good. He spent full time at his office five days a week and came to his office on many Saturdays. His duties included the making of final decisions on all matters of policy and administration. He was an engineer by profession, and in recent *89 years, including 1957 and prior thereto, he had no outside business interests. George P. Thomas, Jr., a son of Thomas, was vice president of the petitioner and his age is in the early 50's. He studied engineering two years at the University of Arizona, and one year at the University of Pittsburgh. He has been employed by petitioner continuously since he left school, with the exception of his war service. He served in World War II, was commissioned as a second lieutenant in the Air Corps and was discharged as a major. He spent his full time as an employee of the petitioner and had no outside interests. His duties included the handling of purchasing, the supervision of maintenance work in the plant and he handled repair parts of the press line of machinery. (Petitioner does a substantial repair business on the hundreds of machines which it has built.) In addition, he approved all purchase vouchers. C. F. Wiley was secretary of the corporation during 1957. He was 54 years of age in 1957 and is the son-in-law of Thomas. Wiley graduated from the School of Business Administration of the University of Pittsburgh in 1926. He was first employed in sales and sales promotion work for an automobile *90 distributor. In 1928 he was employed by the petitioner, first doing clerical work and later he did advertising or sales promotion work. He held an army commission and went on military duty with the Civilian Conservation Corps, where he served from 1933 until the fall of 1937. He thereupon returned to his duties at the petitioner's plant. Wiley continued as purchasing agent and handled the advertising for the company until October 1940 when he was recalled to active duty with the United States Army, where he served until November 1945. He held the rank of lieutenant colonel at the end of his service. After being retired from the Army in 1945 on account of a physical disability, Wiley handled administrative work, but his principal duty was as sales manager for the line of steel fabricating machinery which petitioner built. Petitioner maintained one branch office in the eastern part of the United States, and sales outlets throughout the United States with branches in Europe. Wiley's duties included contacting the sales offices, directing sales work, setting prices on machinery (which were quoted on an individual proposal basis), and supervision of the preparation of the proposals. He *91 also handled advertising and labor relations. Wiley spent full time on behalf of the petitioner and had no outside interests. The board of directors of petitioner delegated to Thomas the authority to determine the compensation to be paid to officers. In 1953 a plan was put into effect whereby all salaried employees of petitioner were to be paid a bonus based upon petitioner's profits. A bonus equal to base salary of three months was paid to all salaried employees of petitioner in 1957. During 1957, Thomas established a commission plan, in addition to the existing bonus plan, whereby C. F. Wiley and George P. Thomas, Jr., each received additional compensation based upon one percent of the volume of the machine and machine parts sales along with press parts sales on which no other commission had been paid either to a dealer or to a salesman. The contract work was not included in the computation. The commission plan was made retroactive to January 1, 1957. In 1957 petitioner's business was divided into two categories. One category consisted of a line of fabricating steel machinery along with sales or parts referred to as press parts for a line of machine presses which had been discontinued *92 a few years after World War II. The other part of the business consisted of building machines from individual designs and specifications submitted by customers. The 1957 net earnings of petitioner were the highest since 1942. John Miller held the position of chief engineer of petitioner in 1957. Compensation paid to Thomas by petitioner for the years 1943 through 1960 was as follows: Year
Salary
Bonus
Total
1960
$ 9,090.00
$ 9,090.00
1959
10,605.00
10,605.00
1958
16,665.00
16,665.00
1957
18,162.50
$4,545.00
22,707.50
1956
15,125.00
1,250.00
16,375.00
1955
15,000.00
15,000.00
1954
15,000.00
3,750.00
18,750.00
1953
15,000.00
3,750.00
18,750.00
1952
15,000.00
564.25
15,564.25
1951
15,000.00
258.30
15,258.30
1950
12,000.00
12,000.00
1949
14,000.00
14,000.00
1948
15,000.00
15,000.00
1947
15,000.00
15,000.00
1946
19,500.00
19,500.00
1945
19,500.00
19,500.00
1944
19,500.00
19,500.00
1943
16,500.00
16,500.00 Compensation paid to George P. Thomas, Jr., by petitioner for the years 1950 through 1960 was as follows: Year
Salary
Commission
Bonus
Total
1960
$8,760.00
$1,137.22
$ 9,897.22
1959
8,760.00
1,952.59
10,712.59
1958
8,760.00
2,119.90
9,890.46
1957
8,770.50
4,304.86
$2,190.00
15,265.36
1956
7,770.00
1,805.00
9,575.00
1955
7,260.00
550.00
7,810.00
1954
7,570.80
1,650.00
9,220.80
1953
7,476.15
1,650.00
9,126.15
1952
7,218.27
7,218.27
1951
6,386.96
6,386.96
1950
5,160.00
5,160.00
Compensation *93 paid to C. F. Wiley by petitioner for the years 1946 through 1960 was as follows: Year
Salary
Commission
Bonus
Total
1960
$8,760.00
$1,137.22
$ 9,897.22
1959
8,760.00
1,952.59
10,712.59
1958
8,760.00
2,119.90
9,890.46
1957
8,770.50
4,304.86
$2,190.00
15,265.36
1956
7,320.00
1,405.00
8,725.00
1955
7,260.00
550.00
7,810.00
1954
7,570.80
1,650.00
9,220.80
1953
7,486.05
1,650.00
9,136.05
1952
7,536.72
7,536.72
1951
6,926.36
6,926.36
1950
5,800.00
5,800.00
1949
5,600.00
5,600.00
1948
5,599.92
5,599.92
1947
5,474.92
5,474.92
1946
5,000.00
5,000.00 Rougraph (now deceased) was employed by petitioner as works manager and manager of the contract department in procuring contracts for building machines for customers from individual designs and specifications. He was paid the following amounts of compensation. Year
Amount
1952
$17,870.76
1953
17,965.24
1954
13,171.56
1955
11,403.52
1956
15,177.38
1957
21,939.49
Rougraph was not an officer of the corporation, held no stock of the corporation, and was not related to the Thomas family in any way. J. W. Stocking, an accountant, has been employed by petitioner as its comptroller since June 1948. His compensation has been $30 per month less than the corporation paid to Wiley and George P. Thomas, Jr., including bonuses *94 but not including commissions. Part of Stocking's time was spent in managing an office building as trustee of an estate for which he received approximately $2,000 per year. He owned none of petitioner's stock and is unrelated to the Thomases. All salaried employees received bonuses of three months' pay in 1957 and 1958, except that officers of the petitioner received no bonuses in 1958. The highest wage rates of hourly workers of petitioner, exclusive of night differentials and amounts paid foremen, increased from 1941 to 1962 as follows: 1941
$1.15
1950
1.80
1957
2.64
1958
2.83
1962
2.99 1/2
The statistics published by the United States Department of Labor show that the average gross hourly wages paid by the basic steel industry increased from $0.63 in 1934 to $3.08 in 1959 as follows: Amount of
Percent of
Period
Increase
Increase
1934-40
$0.21
33
1940-45
0.34
40
1945-49
0.47
40
1949-54
0.55
33
1954-59
0.88
40
1934-59
2.45
389
Petitioner's business is highly cyclical in nature. The following schedule shows petitioner's sales, income (or loss), net earnings after taxes, and dividends paid for the years 1935 through 1961: Net Sales per
Federal In-
Income (loss) per
come Tax
Federal Income
Net Earnings
Dividends
Year
Return
Tax Return
After Taxes
Paid
1935
$ 51,575
[19,666)
[19,966)
1936
217,020
( 2,024)
(15,524)
1937
428,397
( 213)
449
1938
154,395
( 6,268)
(22,421)
1939
334,290
(55,435)
(55,435)
1940
195,978
( 8,729)
( 8,729)
1941
788,064
171,029
156,463
1942
1,199,519
346,902
92,951
1943
1,685,002
356,867
58,533
$ 3,224
1944
755,525
129,758
28,611
9,672
1945
518,702
(10,203)
(10,777)
3,224
1946
812,333
(23,563)
(23,571)
1947
1,030,150
36,737
24,770
1948
809,644
10,605
8,266
1949
419,633
(33,250)
(33,250)
1950
555,745
45,043
33,496
1951
963,087
118,375
42,343
12,090
1952
1,141,087
139,932
57,494
16,120
1953
1,358,266
103,025
46,385
19,344
1954
1,002,507
76,834
43,086
22,568
1955
1,127,499
106,287
56,704
22,568
1956
875,274
83,878
46,992
22,568
1957
1,346,918
144,402 *
75,989
22,568
1958
789,193
(22,613)
(11,312)
16,120
1959
621,828
(38,588)
(19,235)
16,120
1960
855,203
24,887
17,504
16,120
1961
661,305
21,230
14,870
16,120
*95 Opinion Issue I. Interest Deduction Respondent determined that the amount of $2,600 which petitioner paid to George P. Thomas, its president, during the taxable year 1957 and which was claimed as a deduction for interest expense in the return is not an allowable deduction. Essentially, it is respondent's position that the conditional sales contract entered into by Thomas and petitioner in 1942 for the sale of machinery to petitioner did not constitute a bona fide sale giving rise to genuine indebtedness between the parties, but, in reality, the transaction constituted a contribution by Thomas to the capital of petitioner. Petitioner, in opposition, contends that throughout 1957 it was indebted to Thomas in the amount of $65,000 which was the balance due on the purchase of said machinery from the latter; that this indebtedness bore interest at four percent per annum; and that petitioner is enttiled to a deduction as a result of the accrual of interest with respect to said indebtedness under section 163(a)[2] *96 of the 1954 Code. Respondent's determination is, of course, presumptively correct, and the burden of proving error is on petitioner. P. M. Finance Corp. v. Commissioner, 302 F. 2d 786 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court; John Wanamaker, Philadelphia v. Commissioner, 139 F. 2d 644, 646 (C.A. 3, 1943), affirming 1 T.C. 937 (1943). It is a familiar truism in cases of this kind that no comprehensive rule can be laid down to control a decision, but that all facts of record must be considered and given their appropriate weight in arriving at a correct conclusion. The Kelley Co. v. Commissioner, 326 U.S. 521 (1946); Hoguet Real Estate Corporation, 30 T.C. 580, 598 (1958). There have been numerous decided cases in this and other courts involving whether purported sales of property or loans to a corporation were in fact contributions to corporate capital and various criteria have been advanced as guidelines in determining whether the transaction is in substance what it purports in form to be. In distinguishing between payment of dividends on stock and payment of interest on genuine indebtedness, the determining elements, no *97 one of which is conclusive, but all of which are usually recognized for consideration, are: (1) The name given to the instruments and the transaction; (2) the presence or absence of a maturity date for the indebtedness; (3) the source of the payments; (4) the right of the creditor to enforce payment of principal and interest; (5) the right of the creditor to participate in management; (6) whether the creditor subordinates his debt to those of other corporate creditors; (7) whether the corporation is adequately capitalized; (8) the identity of interest between creditor and stockholders; (9) the ability of the corporation to obtain loans from outside lending institutions; and (10) the intention of the parties. Crawford Drug Stores, Inc. v. United States, 220 F. 2d 292 (C.A. 10, 1955); O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court; Wilbur Security Co., 31 T.C. 938 (1958), affd. 279 F. 2d 657 (C.A. 9, 1960) and Clyde Bacon, Inc., 4 T.C. 1107 (1945). In the application of these criteria it is the intention of the parties which is determinative and this intent must be gleaned from the consideration of all pertinent *98 factors in the particular case. Isidor Dobkin, 15 T.C. 31, 33 (1950), affd. 192 F. 2d 392 (C.A. 2, 1951). In order to establish the real intention of the parties evidence aliunde the conditional sales contract is admissible. Proctor Shop, Inc., 30 B.T.A. 721, 725 (1934), affd. 82 F. 2d 792 (C.A. 9, 1936); Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956). Applying the foregoing criteria collectively to the facts of record, we are convinced that the purported sale of the machinery in question to petitioner by Thomas, its controlling stockholder, was nothing more than a contribution to capital. The facts have been fully set forth in our Findings of Fact and no useful purpose would be served by repetition here. We will, however, refer to the salient points which led us to the conclusion that the alleged sale of the machinery and the execution of the promissory note did not create bona fide indebtedness to Thomas. The term "indebtedness," as used in section 163(a), supra, was not intended by Congress to include transactions lacking in economic reality regardless of the formalities adopted by the parties claiming that indebtedness exists. Gilbert v. Commissioner, 248 F. 2d 399, 404 *99 (C.A. 2, 1957), certiorari denied 359 U.S. 1002 (1959). There is no question here with respect to the form of the instruments involved. Respondent recognizes that the conveyance by Thomas was in the form of a conditional sales agreement; that the note given by Thomas to petitioner was in the form of an ordinary promissory note; and that the transaction was recorded on the books of petitioner as a sale of property in return for a promissory note. However, while it is well established that the form or nomenclature of the instruments which evidences the alleged indebtedness is a factor to be considered, it is not of itself conclusive. We are entitled to look beyond the forms and terms employed by the parties to determine whether the intention of the parties is consistent with the purpose of the instruments in question, especially where the transaction was carried on between related and interested parties. P. M. Finance Corp. v. Commissioner, 302 F. 2d 786 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court. At the outset, we note that one of the conditions of the RFC loan of $144,800 made to petitioner in January 1936, which Thomas guaranteed, required Thomas to transfer *100 to petitioner the 13 machines and a crane which he was then leasing to petitioner and which were installed in petitioner's plant. Accordingly, on January 15, 1936, Thomas gave petitioner a bill of sale for the machines and in return received petitioner's note for $99,273. Neither Thomas nor petitioner regarded said transfer in 1936 as a bona fide sale, but, rather, a temporary assignment of the machinery for the period of the RFC loan. Upon payment of such loan the machinery was to be reassigned to Thomas. Indeed, on December 15, 1942, the aforesaid note was cancelled, and on the same day petitioner gave Thomas a bill of sale reconveying all items of machinery (except the Newton Cold Saw) listed in the bill of sale which Thomas had previously given to petitioner on January 15, 1936. Also, on December 15, 1942, Thomas, as seller, and petitioner, as buyer, signed a document labeled "Conditional Sales Agreement" providing for the sale to petitioner of the aforesaid machinery. The sale price was stated as $75,000 and provided for principal payments to be made over a period of 15 years. During the period petitioner was indebted to the RFC, it was precluded from paying to Thomas more than *101 $1,500 per year as a result of any obligation arising from the required transfer of machinery in 1936 from Thomas to petitioner. Nevertheless, during the period of such loan, petitioner accrued machinery rent to Thomas, based upon six percent of $99,273, the stated price of the machinery. Petitioner was also precluded from paying any bond principal and interest to Thomas during the existence of the RFC loan. Nevertheless, bond interest was accrued to Thomas on petitioner's books during such period. Considering the foregoing circumstances, it is clear that during the years prior to the period involved herein, petitioner and Thomas did not deal at arm's-length with respect to the machinery in question and were willing to employ whatever financial relationship was expedient and which would afford them the most advantageous tax consequences, regardless of the substance of their transaction. Looking only to the facts of the years in question, without regard to the circumstances of prior years, we do not believe that petitioner has established that a valid debtor-creditor relationship was created in 1942 with respect to the alleged sale of the aforesaid machinery. The record shows that the *102 sales agreement in question and the underlying promissory note executed in 1942 provided for installment payments of principal as well as annual interest payments on the balance of the sales price. Only a total of $10,000 claimed as principal payments were made to Thomas by petitioner through February 28, 1945. Significantly, the next payment, claimed as a principal payment, was not made until approximately 16 years later on January 31, 1961. Also, year-end balance sheets of petitioner for the years 1945 through 1961 show that at no time was there a year-end balance of less than $13,500 or a combined amount of cash and current receivables of less than $62,000. No convincing evidence was presented as to why payments under the sales agreement were not made to Thomas more regularly, although the accountant and the comptroller for petitioner both testified. On cross-examination, the accountant was asked whether petitioner could have made the payments on the conditional sales agreement as they became due, and he admitted that such installment payments could have been made. Also, we deem it significant that the payment of $5,000 to Thomas by petitioner on January 31, 1961, was made approximately *103 one month after petitioner was notified by respondent that he questioned the genuineness of the indebtedness and that claimed interest payments thereon to Thomas were being disallowed. No evidence was adduced by petitioner, who bears the burden of proof, to explain the sudden resumption of the claimed payments, and it is reasonable to infer that the payment in 1961 (about 16 years after the last payment of principal) was prompted by respondent's disallowance of the interest deduction on the claimed indebtedness. See Wilbur Security Co., 31 T.C. 938, 950 (1958), affd. 279 F. 2d 657 (C.A. 9, 1960). At first blush, the few payments aggregating $10,000 prior to 1957 give some semblance of bona fides to the alleged sale transaction under review. However, when we consider that during most of the years in which no payments were made on the principal the petitioner enjoyed substantial net earnings after taxes and after dividends paid, we must conclude that these payments were mere "window dressing" designed to obscure the realities of the arrangement here involved. Moreover, the presence of said payments ($10,000) do not preclude a contribution to capital. Foresun, Inc., 41 T.C. 706, 714-715 (1964); *104 cf. Commissioner v. The McKay Products Corp., 178 F. 2d 639 (C.A. 3, 1949), reversing 9 T.C. 1082 (1947). (The reversal is cited with approval by us in Foresun, Inc., supra.) Another factor which militates strongly against petitioner's position is shown in the failure of Thomas to compel compliance with the terms of the purported sales agreement, or even to request payment of the principal. The sales agreement in question contained dates for all payments to be made and also provided for enforcement of the agreement upon failure to make payments when due. Both the accountant and the comptroller for petitioner testified that Thomas never made any demands on petitioner to pay the obligations stated in the agreement. Manifestly, the prolonged period of failure by Thomas, the controlling stockholder, to enforce payments on the agreement demonstrates that he did not intend to exercise the enforcement provisions. Zephyr Mills, Inc., 279 F. 2d 494 (C.A. 3, 1960), affirming per curiam a Memorandum Opinion of this Court. From a business viewpoint we believe it would have been too impractical or detrimental for Thomas to exercise his rights in the event of default of payment. Considering *105 the extent of Thomas's holdings in the corporation, the 10-year extension of the aforesaid note granted to petitioner by Thomas and the other substantial economic realities of the instant case, we are convinced that it was not intended that he should exercise such rights in the event of delinquent payments. "Such a course would furnish an apt illustration of killing or irreparably debilitating the goose that lays the golden eggs." Mullin Building Corporation, 9 T.C. 350, 355 (1947), affd. 167 F. 2d 1001 (C.A. 3, 1948). In this connection it is noteworthy that in May 1950, Thomas and petitioner made a so-called extension of the "maturity date" of the entire sales agreement for an additional ten years from December 15, 1957, to December 15, 1967, notwithstanding that at the time of such extension the original agreement still had seven unexpired years. Petitioner offered no explanation with respect to this extension. In Charter Wire, Inc. v. United States, 309 F. 2d 878 (C.A. 7, 1962), where the noteholders had control of the corporation to which they allegedly made a loan and issued new notes with a different maturity date and did not exert their rights as creditors of the corporation, *106 the Court held that bona fide indebtedness was not created. In the course of its opinion the Court said (p. 881): Expectation of payment at maturity is a good indication of the existence of a debt. This expectation, however, must be more than a theoretical one, and in retrospect if it can be shown that the stockholders making the advances were little concerned about the matter of payment of the principal when due, then the taxpayer's position is greatly weakened. * * * It is significant, we believe, that while few payments on principal have been made pursuant to the terms of the sales agreement, excessive amounts claimed as interest on the alleged indebtedness have been paid annually to Thomas since 1943. Through the years 1957 and 1961, these payments total about $37,400 and $47,600, respectively. However, if payments of principal had been made under the sales agreement when due, the total interest would only have approximated $24,000. Obviously, sound business principles did not guide petitioner in paying such excessive amounts of interest to Thomas, particularly in view of the fact that payments of principal could readily have been made annually thereby reducing interest expense *107 substantially. In this connection, it is also noteworthy that at the time of the so-called extension agreement in May 1950, petitioner had already paid Thomas about $19,200 claimed as interest. By extending the agreement from 1957 to 1967 an additional ten years of claimed interest would be made available to Thomas. Furthermore, petitioner did not present any acceptable explanation as to why it paid all of its other corporate obligations during the period 1945 to 1961 although it made only a few token payments on the claimed debt to Thomas. Except for items classified as current liabilities, petitioner's balance sheets for the years 1949 through 1961 show no liabilities other than amounts reflected as owing to Thomas. The balance sheet for the year 1946 shows amounts owing, but these were reduced on both the 1947 and 1948 balance sheets and do not appear on the 1949 balance sheet. Apparently, petitioner was not desirous of using its earnings to reduce the principal balance of the alleged indebtedness to Thomas. From 1951 through 1961 petitioner paid dividends in the total amount of $202,000. In 1951 Thomas and members of his family owned about 79 percent of petitioner's shares of stock, *108 and in 1954 and subsequent years, the percentage increased to about 82 percent. Thomas, at all times pertinent herein, owned a majority of petitioner's stock. By virtue of his control of petitioner, Thomas was able to direct dividends of over $100,000 to himself and over $60,000 to members of his family during the period 1951 through 1961, a time when petitioner claimed to have an indebtedness owing to Thomas since 1942 but on which it made few payments. In O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court, the Court of Appeals, in denying an interest deduction to the corporate taxpayer for payment on a promissory note given to its principal stockholder for certain assets transferred to it, emphasized that although the corporation paid its other obligations promptly, it made no payment on the principal of said demand note for over five years, and then only after its genuineness was questioned by a revenue agent. We believe that the reasoning in O. H. Kruse Grain & Milling, supra, is applicable to the instant case. Perhaps, most significant, is the fact that by claiming a purchase of the machines in question from *109 Thomas for $75,000 in 1942, petitioner, in addition to reporting a large interest deduction for many years, is able to claim a stepped-up basis on the machines and, hence, a substantial depreciation deduction. In his individual Federal income tax return for 1942, Thomas showed his machinery to have been purchased prior to 1920 at a cost of $45,000 with $37,369.55 of depreciation having been taken, and an estimated remaining useful life of six and one-half years. After the alleged sale of the machinery in 1942, petitioner on its 1942 corporate tax return deducted depreciation on the machinery computed at 16 percent per year on $75,000. In support of its position petitioner has cited, inter alia, Sun Properties, Inc. v. United States, 220 F. 2d 171 (C.A. 5, 1955); Ainslie Perrault, 25 T.C. 439 (1955), affd. per curiam 244 F. 2d 408 (C.A. 10, 1957); Warren H. Brown, 27 T.C. 27 (1956); Clyde Bacon, Inc., 4 T.C. 1107 (1945). We have carefully considered these cases and do not find them here controlling. In the light of the foregoing, and upon the record as a whole, we have concluded that the payment here sought to be deducted was not interest paid on a bona fide indebtedness, and we *110 approve respondent's determination on this issue. Zephyr Mills, Inc. v. Commissioner, 279 F. 2d 494 (C.A. 3, 1960). In view of our determination on this issue, we find no reason to consider the alternative contention suggested by respondent. Issue II. Reasonableness of Compensation Respondent allowed to petitioner corporation a total deduction of $34,675 for the taxable year 1957, as salary to George P. Thomas, George P. Thomas, Jr. and C. F. Wiley, who were the three principal officers of petitioner. During 1957, petitioner paid George P. Thomas, Sr., $22,707.50, of which $6,332.50 was disallowed; $15,265.36 to George P. Thomas, Jr., of which $5,690.36 was disallowed; and $15,265.36 to C. F. Wiley, of which $6,540.36 was disallowed. Ascertainment of what is reasonable compensation for services rendered is essentially a question of fact to be determined by the facts and circumstances of each particular case. Sommerfeld Machine Co., 15 T.C. 453, 466 (1950), affd. per curiam 195 F. 2d 736 (C.A. 3, 1952). The burden of proving reasonableness of compensation is upon petitioner. Botany Worsted Mills v. United States, 278 U.S. 282 (1929); Sportwear Hosiery Mills v. Commissioner, 129 F. 2d 376 *111 (C.A. 3, 1942), affirming 44 B.T.A. 1026 (1941). The problem before us is to determine what is a reasonable allowance for salary or other compensation to each of the three executives for the taxable year 1957 under the provisions of section 162, supra. The record shows that for many years petitioner was engaged in an extensive machine fabrication business in this country and overseas. The machine manufacturing jobs handled by petitioner were rather large in scope, and difficult from an engineering standpoint. The actual services performed by each of the three executives in question are summarized in our Findings of Fact, and need not be repeated here. Suffice it to say that petitioner's officers were all highly capable and industrious men. Each executive involved herein was thoroughly trained, experienced, possessed a high degree of intelligence and technical knowledge in the machine tool trade, worked skillfully and efficiently for long hours; rendered very valuable services to petitioner; and were entitled to substantial compensation. George P. Thomas, Sr., was an inventor and was responsible for valuable innovations in the automatic manufacture of machinery in petitioner's plant. *112 Considering the business acumen of these executives, the volume of the business handled by petitioner, the success of petitioner's operations, its financial history, and the compensation paid to said officers in prior years, we believe that the salaries under review were comparatively modest. After considering all of the evidence, we have reached the conclusion that the salary paid to each of the officers involved herein during 1957 constituted reasonable compensation. No one factor was decisive in the formulation of our conclusion. J. J. Hart, 9 T.C. 135, 140-141 (1947). We are aware that the machine tool industry is one which is subject to great fluctuations, and that the compensation of the executives in 1957 was geared largely to the profits realized during that year. This is, of course, a factor to be considered, but in our opinion, on the whole, it is apparent that the respective salaries paid to petitioner's officers are fair and reasonable. We are also mindful that the board of directors of petitioner left the fixing of compensation to its chairman, George P. Thomas, Sr. We have, of course, carefully scrutinized this factor in the light of all the circumstances. Despite this *113 factor, however, we are satisfied that the compensation paid to each of the three executives for the year in question was conservative. In reaching this conclusion, we have found it unnecessary to extend our discussion to the further effect of the low salaries for prior years. See Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); Universal Steel Co., 5 T.C. 627, 636 (1945). Upon consideration of the entire record, we believe that the salaries paid to the officers in question during 1957 were reasonable, fair, and proper compensation for the services rendered by them in that year. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all references are to the Code of 1954.↩
*. During April 1940, a machine described as a Newton Cold Saw was sold for $900. The account on the books of the taxpayer, denominated Deferred Liability on Machinery assigned from George P. Thomas, was debited in the amount of $2,639.25 on June 30, 1941. $900, representing proceeds of such sale, was paid to Thomas by the taxpayer.
*. $154,768 prior to disallowance of compensation and interest.↩
2. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. * * *↩