T.C. Memo. 2019-32

UNITED STATES TAX COURT

BROKERTEC HOLDINGS, INC. f.k.a. ICAP US INVESTMENT
PARTNERSHIP, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3573-17.            Filed April 9, 2019.

David B. Blair, Robert L. Willmore, and Teresa M. Abney, for petitioner.

Frederick Petrino, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge: Respondent determined deficiencies in petitioner's

Federal income tax for tax years ended (TYE) March 31, 2010, 2011, 2012, and

2013 (years involved), as follows:

| [*2] | TYE Mar. 31 | Deficiency |
|---|---|---|
| | 2010 | $29,331,755 |
| | 2011 | 5,638,221 |
| | 2012 | 4,587,552 |
| | 2013 | 4,046,885 |

The deficiencies arise from members of petitioner's consolidated group's (petitioner's affiliates) participation in the State of New Jersey's Economic Development Program, wherein New Jersey made cash grants to petitioner's affiliates during the years involved. After concessions,[1] the issue involved is whether the cash grants are taxable, as respondent maintains, or nontaxable contributions to capital, as petitioner maintains. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, in effect for the years involved, and all amounts are rounded to the nearest dollar.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

---

[1]The parties filed a Joint Stipulation of Settled Issues on August 2, 2017, wherein they resolved the following two issues. (1) For TYE March 31, 2010, respondent determined in the notice of deficiency that petitioner must include in income a sec. 481(a) adjustment of $68,926,539 resulting from a change in method of accounting for BEIP grants received by petitioner's affiliates. The parties agreed that no such adjustment would be included in petitioner's gross income for TYE March 31, 2010. (2) The parties agreed that petitioner would not be entitled to a corresponding increase in the basis of certain stock.

**[*3]** When petitioner filed its petition, its principal place of business and mailing address were in Jersey City, New Jersey.[2]

I.    Petitioner

During the years involved, petitioner was a financial services company, specifically a voice and electronic broker-dealer.  It was the parent of a consolidated group that included ICAP, North America, Inc., formerly known as Garban Intercapital North America, Inc. (Garban), and First Brokers Holdings Inc., formerly known as First Brokers Securities, Inc. (First Brokers).  Petitioner, under its former name ICAP US Investment Partnership, filed a Form 1120, US Corporation Income Tax Return, for each of the years involved for the consolidated group.[3]  On October 2, 2014, petitioner converted to a Delaware corporation as a result of a reorganization and changed its name to BrokerTec Holdings, Inc.

---

[2]Petitioner is a corporation organized and existing under the laws of the State of Delaware.

[3]The record does not reveal whether petitioner had elected, under the check-the-box rules of secs. 301.7701-1, 301.7701-2, and 301.7701-3, Proced. & Admin. Regs., to be treated as an association taxable as a corporation.  Respondent does not dispute that petitioner was entitled to file Form 1120 for the consolidated group for the years involved.

[*4]   Garban was an interdealer-broker.  It acted as an intermediary, arranging transactions in the financial services industry, typically between banks and investment banks.  Garban arranged transactions in a wide array of products, including securities, foreign exchange, and energy.  Garban provided its clients the opportunity to trade anonymously, through a neutral party, at the most attractive prices available.

First Brokers also was an interdealer-broker.  It specialized in corporate debt securities, high-yield securities, mortgage-backed securities, high-grade industry securities, and various other debt-driven markets.  Garban acquired First Brokers on or about April 30, 2002.

II.   The Attack of September 11, 2001

On September 11, 2001, Garban had offices in both towers of the World Trade Center in New York City wherein it employed 750 brokers and other employees.  Each office was specially outfitted for Garban's business, having a large, open space for trading areas.  The trading areas had false floors to allow Garban to run lines from the telephone rooms and computer rooms to each broker's desk.  Both of Garban's offices were destroyed in the terrorist attack of September 11, 2001.  The day after the attack, Garban's managers met in

**[*5]** borrowed office space.  Donald Marshall, one of Garban's directors, was tasked with quickly finding new temporary and permanent office space.

On September 11, 2001, First Brokers employed approximately 80 individuals at its office near the World Trade Center. Although First Brokers' office was not directly damaged by the attack, the destruction in the area rendered it nearly impossible for First Brokers employees to return to the firm's office to conduct business.  Consequently, First Brokers' management concluded that the firm had to search for permanent office space elsewhere in New York or in New Jersey.

III.     Garban's Search for a New Office

Garban secured temporary office space in midtown Manhattan, but it was not adequate to allow the company to fully resume business.  Mr. Marshall's search for a permanent office was restricted because Garban needed a large, open space to build a trading room with a false floor to support the expansive telephone and computer networks required by the business.  No preexisting space met Garban's needs; therefore Mr. Marshall sought new construction that could build the office to its specifications.  The firm budgeted $50 to $60 million for construction purposes.

[*6]   Lower Manhattan was ruled out as a location because (1) a number of Garban's employees did not want to return to the vicinity of the World Trade Center and (2) the State of New York was unable to offer financial assistance.  On the other hand, when Mr. Marshall contacted New Jersey, he learned that New Jersey had a program, the New Jersey Business Employment Incentive Program (BEIP), which offered financial incentives to attract businesses to move to the State.  The New Jersey Economic Development Authority (EDA) administered the BEIP.

IV.   New Jersey's Financial Assistance

The EDA is an independent agency of the State of New Jersey.  Its stated mission is to develop New Jersey's economy and revitalize its cities by inducing businesses and not-for-profit organizations to move to or remain in New Jersey by providing financial and technical assistance.  During the years involved the EDA's staff included (1) a sales force that promoted the EDA's programs to businesses; (2) an underwriting group that determined whether the proposed projects qualified for the EDA's program offerings, which included cash grants, loans, loan guaranties, and bond deals; and (3) a portfolio services group that worked with the recipient through the life of the incentive project.  Overseeing the staff was the EDA board.  The EDA board was charged by the BEIP's enabling law to review

[*7] and approve or disapprove financial assistance under the BEIP to entities recommended by the staff. The EDA board comprised individuals from both the State government and private industry, including the financial industry. Overseeing the program was the Governor of New Jersey, who had unrestricted veto authority over the action of the board.

During the years involved, the EDA made cash grants under the BEIP.[4] Enacted as part of the Business Employment Incentive Program Act, Assembly No. 1415 (N.J. introduced Jan. 29, 1996) (enabling law), the BEIP was designed "[t]o grow New Jersey's economy and revitalize its cities through providing financial and technical assistance to businesses, not-for-profits, and the local government". Specifically, the EDA used BEIP grants to induce companies to locate in New Jersey.

It was intended that a business attracted to New Jersey by a BEIP grant would operate as an anchor for a neighborhood. This, in turn, would encourage other large employers to move into the neighborhood, as well as attract other businesses, such as restaurants and shops, that would be patronized by the BEIP grant recipient's employees. In addition to attracting businesses to New Jersey, the State had compiled a list of municipalities, called "urban-aid municipalities",

---

[4]The BEIP is no longer used by the State of New Jersey.

[*8] that demonstrated "certain demographic metrics that would show that there's been a lack of investment over time." The State sought to encourage businesses to move their operations to those urban-aid municipalities. Certain businesses, such as financial services, were referred to as "target industries". The State provided larger BEIP grants to targeted industries willing to locate their business facilities in urban-aid municipalities.

The BEIP was a discretionary aid program. An applicant seeking to participate in the program would not automatically receive a grant after filing an application. Rather, the EDA board made a determination as to whether the applicant would receive an award, and in what amount.[5]

New Jersey's enabling law directed that the award of BEIP grants be based on criteria developed by the EDA after taking into consideration (1) the number of eligible employees at the project site, (2) the expected duration of these positions, (3) the type of contribution the business could make to the long-term growth of the New Jersey economy, (4) the amount of other financial assistance the business would receive from the State for the project, and (5) the total dollar investment the business was making in the project. Applicants were required to relocate or

---

[5]In contrast, in an entitlement program, or an as-of-right program, if the applicant meets the stated criteria, it automatically receives the incentive or grant upon filing the proper forms. No review by a board or commission occurs.

[*9] expand a project in New Jersey and maintain a minimum employment level at the project site. Applicants were also required to remain at the project site for a period of at least 150% of the period over which the BEIP grant was paid. As cash disbursements were usually paid over a period of 10 years, the grant recipient was generally obligated to remain at the project site for 15 years. Grants were paid after the creation of the jobs in New Jersey, beginning after the grant recipient had operated under its agreement with the EDA for at least one year, and were based on remitted New Jersey State income tax withheld from the recipients' employees' wages. The amount of the grant awarded by the EDA was 30% to 80% of the recipient's employees' State income tax withholdings. The EDA had discretion in determining this amount. Although the grant was based on the withholding tax paid by the employees, the grant was not a rebate of the tax paid. Rather, the grant was paid from the State's general appropriations.

V.     The BEIP Grant Applications

A.     Garban's BEIP Application Process

Garban engaged Stadtmauer, Bailkin, Biggins, LLC (SBB), a Trenton, New Jersey, law firm, to assist it in applying for BEIP grants.[6] SBB Attorneys Jay

---

[6]The law firm is now known as Biggins Lacy Shapiro & Co.

[*10] Biggins, Joe Lacy, and Laura Gitlin guided Garban through each step of the BEIP grant application process.

Mr. Lacy drafted, and on September 28, 2001, submitted, Garban's BEIP application to the EDA. The goal of the application was to highlight each aspect of Garban's business that would make it attractive to the EDA. Garban's application emphasized the fact that Garban was a financial services company (one of the EDA's targeted industries) and that Garban intended to house its facilities in Jersey City, New Jersey (one of the EDA's targeted areas).[7] In the application's cover letter, Garban stated that its move to New Jersey would involve the following expenditures:

> Real Estate: The Company intends to lease an existing facility able to accommodate certain of the Company's operations. The Company requires approximately 140,000 to 150,000 square feet. The space will require substantial tenant improvements estimated at $45 million.

> Employment/Payroll: The project will result in the relocation of approximately 350 new high quality jobs to the State of New Jersey. The new employees will have a minimum average salary of approximately $125,000, resulting in an estimated annual payroll of approximately $43 million.

---

[7]The EDA allowed companies to receive a conditional approval with a "to be determined" project site. However, the applicant was still required to inform the EDA as to the actual project site in order to receive final approval.

**[*11]** Technology and FF&E:[8]  The Company anticipates an initial capital investment in technology and FF&E in [sic] of approximately $24.7 million.

The application letter highlighted that Garban's heavy use of technology would require it to make constant capital expenditures to keep the equipment up to date.  The letter stated that the build-out of the office space would create local construction jobs and generate the sale of equipment and material as well as capital expenditures necessary to construct office space.  The application letter also noted that the presence of the large number of new well-paid employees would encourage other businesses to create jobs to cater to Garban's employees and that the presence of a financial services firm such as Garban would make the Jersey City area more attractive to other high-end businesses.

Although the EDA staff had discretion in calculating the grant amount, the EDA staff used a standard "Business Employment Incentive Guidelines" form to score the project in determining the grant percentage they would recommend to the EDA board to consider.  At the time Garban applied for a BEIP grant, the guidelines were as follows:

PROJECT LOCATION

2=Targeted (defined as urban-aid municipalities only)
0=Non-targeted

---

[8]The term "FF&E" is not defined in the record.

[*12] CREATION OF ELIGIBLE NEW JOBS

If in targeted (urban-aid) municipality:   If in a non-targeted (non urban-aid) municipality
4=200+                                             4=250+
3=126-199                                          3=151-249
2=76-125                                           2=126-150
1=25-75                                            1=75-125
[Note: Minimum of 25 jobs in an urban-aid municipality or 75 jobs in a non urban-aid municipality]

JOBS AT RISK

3=501+
2=210 to 500
1=25 to 200
0=1 to 24

INDUSTRY TYPE

2=Targeted
0=Non-Targeted

LEVERAGE OF PRIVATE INVESTMENT TO STATE INVESTMENT/EXPOSURE

2=3 to 1 and up
1=2 to 1
0=1 to 1

PRIVATE INVESTMENT (DEBT AND EQUITY) BY THE APPLICANT IN PROJECT

3=51% - 100%
2= 31% - 50%
1= 0% - 30%

AVERAGE WAGES OF ELIGIBLE NEW EMPLOYEES

3=$50,001+
2=$30,001 - $50,000
1=$18,001 - $30,000
0=$0 - $18,000

TOTAL POSSIBLE SCORE = 19 (maximum grant = 80%)

| SCORE | GRANT | SCORE | GRANT | BONUS INCREASES IN BEIP |
|---|---|---|---|---|
| 16+ | 80% | 10 | 50% | GRANT PERCENTAGE[9] |

_____

[9]Bonus increases could not result in an increase above the maximum 80%

(continued...)

| [*13] 15 | 75% | 9 | 45% | |
|---|---|---|---|---|
| 14 | 70% | 8 | 40% | 10%=If project is located in a UCC Municipality |
| 13 | 65% | 7 | 35% | 10%=If recycling a "Brownfield" site |
| 12 | 60% | 0-6 | 30% | 10%=If job creation is 500 or more |
| 11 | 55% | | | |

URBAN COORDINATING COUNCIL MUNICIPALITIES (new additions to list in "bold"):

| | | |
|---|---|---|
| Asbury Park | Neptune Township | Plainfield |
| Camden | Newark | Pleasantville |
| Elizabeth | New Brunswick/Franklin | Trenton |
| Jersey City | Perth Amboy | Vineland |
| Long Branch | | |

Relying on the guidelines, the EDA Staff gave Garban the following scores:

| Criteria | Score |
|---|---|
| Location:  Jersey City | 2 |
| Job creation:  250 | 4 |
| Jobs at risk:  0 | 0 |
| Industry:  financial services | 2 |
| Leverage:  UEZ tax exemption | 3 |
| Equity (%):  100% | 3 |
| Wages:  $125,000 | 3 |

Total score:  17 = 80%
Recommended term:  10 years
Estimated total project costs = $69,700,000

The EDA staff determined Garban was financially viable and that the BEIP grant

would be a material factor in Garban's decision to locate in New Jersey.  On

---

[9](...continued)
grant.

[*14] October 11, 2001, the EDA staff recommended to the EDA board that Garban receive an 80% grant for a period of 10 years.

On November 8, 2001, the EDA sent a letter to Garban informing the company that the EDA board had approved Garban's application and offered the company a BEIP grant for a 10-year period at the 80% level. Garban's representatives and the EDA then began negotiating a final agreement. The EDA relied on a standard agreement, drafted by the New Jersey Office of the Attorney General. Garban sought to modify that section of the agreement governing remedies available to the State should Garban default on its obligations. The EDA agreed to Garban's modification request.

Garban also sought several changes to the commitments it made on its BEIP application after receiving the November 8, 2001, approval from the EDA board. First, Garban sought to change the location of its office. In its application Garban stated that the proposed project would be located at 545 Washington Boulevard, or another facility within New Jersey to be determined, in Jersey City, New Jersey. Subsequently, Garban decided to place its office in the Harborside Financial Center in Jersey City. The EDA approved this request, noting that the move did not affect Garban's overall score because the project continued to be located in a targeted location of Jersey City. In order to increase the amount of the BEIP grant,

[*15] Garban sought to modify its employment commitment to increase the number of employees located in New Jersey. In its application, Garban had committed to hiring 250 employees. Garban chose this figure because of the uncertainty in the business climate, i.e., in the aftermath of the September 11 terrorist attack the company was unsure as to the number of its employees willing to continue to work. Because Garban would be subject to penalties under the BEIP agreement if the company did not meet the employment goal, the company made a conservative commitment. However, after receiving approval from the EDA board, Garban had a higher level of confidence with respect to the business climate and sought to increase its employment commitment to 640 employees. Garban further sought to adjust its estimated average salary to $235,000 per employee.[10] On April 2, 2002, the EDA informed Garban that its requests had been approved and Garban's BEIP grant, originally estimated to be $8,300,000 paid over 10 years, was increased to an estimated $50,967,000 over 10 years.

With these changes approved, Garban's chief operating officer, James Nance, signed the BEIP agreement on April 2, 2002. The BEIP agreement

---

[10]Politics was also a factor in making this change. Mr. Marshall was informed that the then-incoming Governor was considering capping BEIP grants because of budget concerns; thus, the change was requested before the change in administration.

[*16] detailed Garban's and the EDA's commitments, rights, and responsibilities. Garban committed to employing 640 full-time workers at the Harborside Financial Center location for 15 years. Garban agreed that it could not move its New Jersey office during that period and that it would not move its office to another State without the express written approval of the EDA.

Upon signing the BEIP agreement, Garban prepared to move to the Harborside Financial Center in Jersey City. Construction of the Harborside Financial Center began in the fall of 2001. In April 2002 Garban was given access to the construction site to customize its office space to the standard of the World Trade Center facilities. Garban installed an electric generator on the roof of the building as a power backup. In a memorandum to its board of directors Garban stated that, with respect to the Harborside Financial Center, "US management have indicated that anticipated expenditure on the US build out is likely to be in the region of US$42m (some US$38m has been committed). After taking account of a US$6m landlord lease contribution, net cash outflows were predicted to be $36m." On November 15, 2002, Garban achieved the "minimum eligibility threshold", qualifying it to receive BEIP grant payments.

Garban first received its BEIP grants in May 2004 after Garban made the capital outlays necessary to build its office. As noted supra p. 9, the grant

[*17] payments were to be made from the State's general appropriations; however, beginning in 2003, the EDA was authorized to issue bonds to fund the BEIP in years in which a State appropriation was insufficient to pay grants. Because the State legislature failed to appropriate sufficient funds in some years, Garban did not receive all or any of its BEIP grant payments from State appropriations. Garban received BEIP payments as follows:

| TYE Mar. 31 | Amount |
| --- | --- |
| 2005 | $9,764,431 |
| 2006 | 13,402,706 |
| 2007 | 16,911,002 |
| 2008 | -0- |
| 2009 | 18,781,003 |
| 2010 | 21,900,336 |
| 2011 | -0- |
| 2012 | 24,290,706 |
| 2013 | 21,980,218 |
| 2014 | 20,419,627 |

Garban received a total of $147,450,030[11] from the BEIP. The State of New Jersey placed no restrictions on Garban's use of this money. The BEIP grant stabilized Garban's financial position. Inasmuch as Garban was financially able to pay for the improvements to its Harborside Financial Center office without the grant moneys, Garban (as well as First Brokers, see infra p. 21) used all of its

---

[11]This total represents the rounded sum of the BEIP grants.

[*18] BEIP proceeds to acquire all of the stock of ICAP Holdings (USA), Inc. This acquisition was part of a series of transactions designed to expand petitioner's business into other trading markets.

B.       First Brokers' BEIP Application Process

After the September 11, 2001, attack First Brokers worked out of borrowed office space.  Requiring a permanent solution, First Brokers engaged SBB on October 19, 2001, and filed a BEIP application with the EDA on October 23, 2001.  In its application letter, First Brokers highlighted the following expenditures:

Real Estate:  The Company intends to lease approximately 17,000 square feet within an existing facility which is able to satisfy the company's cost and facility/technology requirements.  The space will require tenant improvements estimated at $2 million.

Employment/Payroll:  The project will result in the relocation of approximately 80 new high quality jobs to the State of New Jersey. The new employees will have a minimum average salary of approximately $218,000, resulting in an estimated annual payroll of approximately $17.44 million.

Technology and FF&E:  The Company anticipates an initial capital investment in technology and FF&E of approximately $500,000.

First Brokers' application highlighted attributes similar to those highlighted by Garban in its application and stated that First Brokers intended to move to a facility in Hoboken, New Jersey.

[*19] The EDA staff determined First Brokers was financially viable and found that the BEIP grant would be a material factor in First Brokers' decision to locate in New Jersey. Relying on the same guidelines used for Garban, the EDA staff gave First Brokers the following scores:

| Criteria | Score |
|---|---|
| Location: Hoboken-targeted | 2 |
| Job creation: 80 | 2 |
| Jobs at risk: 0 | 0 |
| Industry: Financial services-targeted | 2 |
| Leverage: All private | 2 |
| Equity (%): 100% | 3 |
| Wages: $218,000 average | 3 |

Total score: 14 = 70%
Recommended term: 10 years
Estimated total project costs = $2,500,000

The EDA board considered and approved a BEIP grant for First Brokers on November 13, 2001.

Before any other action was taken, Garban acquired First Brokers on or about April 30, 2002. On August 13, 2002, Garban sent a letter to the EDA requesting that the agency approve Garban's acquisition of First Brokers and approve changing First Brokers' project location from Hoboken to Jersey City. First Brokers informed the EDA that upon the acquisition (1) First Brokers would retain its corporate existence and be a wholly owned subsidiary of Garban and

**[*20]** (2) First Brokers would move into Garban's Harborside Financial Center office. Garban requested that the EDA incorporate First Brokers into Garban's agreement with the EDA. To that end, Garban requested that its job commitment under the agreement be increased from 640 to 720 and that the average wages in the BEIP agreement be increased to $260,000. Upon acceptance of these modifications to the Garban BEIP agreement, First Brokers stated that it intended to withdraw its BEIP application.

The EDA partially approved Garban's request: First Brokers was permitted to change its project site from Hoboken to the Harborside Financial Center. But the EDA declined to allow Garban and First Brokers to combine their grants as the grants involved different percentages (i.e., 80% versus 70%) and different start dates. On August 28, 2002, First Brokers and the EDA executed the BEIP agreement.

First Brokers received BEIP grants as follows:

| TYE Mar. 31 | Amount |
| --- | --- |
| 2005 | $1,972,393 |
| 2006 | 3,009,710 |
| 2007 | 2,818,960 |
| 2008 | 2,223,619 |
| 2009 | -0- |
| 2010 | 2,353,807 |
| 2011 | 3,285,404 |

**[*21]**

| | |
|---|---|
| 2012 | -0- |
| 2013 | 3,622,072 |
| 2014 | 3,044,380 |

As noted supra pp. 17-18, these amounts were used to acquire all of the stock of

ICAP Holdings (USA), Inc.

VI.     Petitioner's Tax Returns

Petitioner timely filed its Federal income tax returns for the years involved.

Petitioner excluded the following amounts of BEIP payments from those returns,

asserting they are nontaxable, nonshareholder contributions to capital:

| TYE Mar. 31 | Amount excluded |
|---|---|
| 2010 | $14,878,473 |
| 2011 | 16,109,204 |
| 2012 | 13,107,291 |
| 2013 | 11,562,529 |

OPINION

I.     Introduction

Gross income generally means all income from whatever source derived.

See sec. 61; sec. 1.61-1(a), Income Tax Regs.  Because of the sweeping scope of

section 61, the Supreme Court has held that exclusions from income must be

narrowly construed.  Commissioner v. Schleier, 515 U.S. 323, 328 (1995).

**[\*22]** Petitioner argues that it falls under one such exclusion:  section 118(a),[12]

which provides that, in general, "[i]n the case of a corporation, gross income does

not include any contribution to the capital of the taxpayer."  As relevant in this

matter, section 1.118-1, Income Tax Regs., provides:

> In the case of a corporation, section 118 provides an exclusion from
> gross income with respect to any contribution of money or property to
> the capital of the taxpayer. * * * Section 118 also applies to
> contributions to capital made by persons other than shareholders.  For
> example, the exclusion applies to the value of land or other property
> contributed to a corporation by a governmental unit or by a civic
> group for the purpose of inducing the corporation to locate its
> business in a particular community, or for the purpose of enabling the
> corporation to expand its operating facilities.  However, the exclusion
> does not apply to any money or property transferred to the
> corporation in consideration for goods or services rendered, or to
> subsidies paid for the purpose of inducing the taxpayer to limit
> production. * * *

Section 118 was originally enacted as part of the Internal Revenue Code of

1954, ch. 736, 68A Stat. at 39, without counterpart in earlier versions of the Code.

While the section does not contain a definition of "contribution to the capital", the

---

[12]Congress amended sec. 118(b) to provide that the term "contribution to
capital" does not include "any contribution by any governmental entity or civic
group (other than a contribution made by a shareholder as such)", effective as of
the date of enactment of the statute, December 22, 2017, except that contributions
made by a governmental entity pursuant to a master development plan approved
before the enactment date are not affected by the statute.  Tax Cuts and Jobs Act of
2017, Pub. L. No. 115-97, sec. 13312(a)(1)-(3), 131 Stat. at 2132-2133.

**[\*23]** Senate Finance Committee report, S. Rept. No. 83-1622, at 18 (1954), 1954

U.S.C.C.A.N. 4621, 4648, stated:

> The House and your committee's bill provide that in the case of a corporation, gross income is not to include any contribution to the capital of the taxpayer. This in effect places in the code the court decisions on the subject. It deals with cases where a contribution is made to a corporation by a governmental unit, chamber of commerce, or other association of individuals having no proprietary interest in the corporation. In many such cases because the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a payment for future services.

We deem reviewing the judicial decisions as to the meaning of the term

"contribution to the capital of the taxpayer" within the purview of section 118 to

be instructive, and we now do so.

In Edwards v. Cuba R.R. Co., 268 U.S. 628 (1925), the Supreme Court

articulated a functional use test with respect to the characterization of

contributions to a corporation that operated a railroad in Cuba. The Cuban

Government paid the taxpayer subsidies for the construction and maintenance of

certain railroad lines. Noting that the payments were not given as gratuities but

were provided to induce the construction and operation of railroads to serve the

public at large, the Supreme Court held that the payments were not "to be used for

the payment of dividends, interest or anything else properly chargeable or payable

**[*24]** out of earnings or income", were "not made for services rendered or to be rendered", and "were not profits or gains from the use or operation of the railroad". Id. at 632. Consequently, the Court held that the payments did "not constitute income within the meaning of the Sixteenth Amendment." Id. at 633.

In contrast, in Tex. & Pac. Ry. Co. v. United States, 286 U.S. 285 (1932), the Supreme Court concluded that income subsidies paid to the taxpayer railroad were taxable. During World War I the Federal Government took control of the railways. Upon relinquishing control, railroads were guaranteed a "minimum operating income." Id. at 288. If a railroad's income fell below a fixed minimum, the Government was obliged to make up the deficiency; if the railroad's income exceeded a certain amount, the railroad was bound to repay the excess payment to the Federal Treasury. Id. at 289. The Supreme Court distinguished Cuba R.R. Co., stating that in the earlier case

> the payments were conditioned upon construction work performed. Here, they were to be measured by a deficiency in operating income, and might be used for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within the corporate authority, just as any other operating revenue might be applied. The government's payments were not in their nature bounties, but an addition to a depleted operating revenue consequent upon a federal activity. [Id. at 289-290.]

**[*25]** Subsequently, in Detroit Edison Co. v. Commissioner, 319 U.S. 98, 99 (1943), the Supreme Court ruled on whether payments to the taxpayer telephone company for the "estimated cost of the necessary construction" with regard to extending "facilities" to service those customers were included in the taxpayer's basis for purposes of depreciation. The taxpayer added the disputed payments, when received, to its surplus, and "[t]hey have not been taxed as income, presumably because it has been thought to be precluded by this Court's decisions in Edwards v. Cuba R. Co.". Id. at 103. Focusing on the motivation of the contributors of the funds, the Supreme Court reasoned that "[i]t is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company." Id. at 102. As a consequence of its finding that the payments were not capital contributions but rather the "price of service", the Supreme Court concluded that in calculating cost basis for depreciation, the customer payments could not be considered. Id. at 103.

In 1949 the Court of Appeals for the Third Circuit, where an appeal in this matter would ordinarily lie, decided Commissioner v. McKay Prods. Corp., 178 F.2d 639 (3d Cir. 1949), rev'g 9 T.C. 1082 (1947), a case similar to the case now before us.

[*26]        People in the community of Sayre, Pennsylvania, sought during the depression to bring industries to town for the obvious purpose of increasing local payrolls and thus to promote general prosperity.  To this end, a group of citizens organized Valley Industries, Inc., a Pennsylvania non-profit corporation, and subscribed a sum of money to it.  A company which is in fact the taxpayer's predecessor, but will be referred to as the taxpayer moved to town and received a plant for the conduct of its business. * * * [Id. at 640.]

The terms of the agreement involved in McKay Prods. Corp. were that Valley Industries would purchase and improve a vacant factory building to be occupied by the taxpayer.  The property would be deeded to the taxpayer once it had moved to Sayre and had paid $5 million in payroll, which it was estimated would take approximately 10 years.  The payroll condition was later waived and the property transferred to the taxpayer after the taxpayer had advanced money to Valley Industries to enable it to meet its obligations.  Id. n.2.

The Court of Appeals addressed the issue of whether a corporation could receive a contribution of capital from a nonshareholder.  The court held that it could and that the transfer of property by a nonshareholder was a capital contribution, i.e., that Valley Industries contributed to the taxpayer's working capital.  Id. at 643.  The court stated that "'[w]orking capital' in common parlance means the value of that with which the enterprise carries on its activity.  How much stake is in the game?  What is the amount of money which is in the

[*27] business?" <u>Commissioner v. McKay Products Corp.</u>, 178 F.2d at 642. The court found that the transfer was not a payment to the taxpayer for services. While the taxpayer received consideration for the move to Sayre, i.e., the transfer of the property, the mere presence of consideration did not preclude the treatment of the contribution as a gift to the taxpayer. <u>Id.</u> at 643.

The ruling by the Court of Appeals for the Third Circuit created a split with the Court of Appeals for the Eighth Circuit, which had come to the opposite conclusion with respect to contributions of property by nonshareholders in <u>Commissioner v. Brown Shoe Co.</u>, 175 F.2d 305 (8th Cir. 1949), <u>rev'g</u> 10 T.C. 291 (1948), <u>rev'd</u>, 339 U.S. 583 (1950).[13] To resolve this split, the Supreme Court granted certiorari in <u>Brown Shoe Co.</u>

In <u>Brown Shoe Co. v. Commissioner</u>, 339 U.S. at 584, the taxpayer received cash and other property from community groups in several different municipalities to induce the taxpayer to locate or expand its factory operations within those municipalities. The taxpayer entered into three main categories of agreements

_____

[13]The Court of Appeals for the Eighth Circuit had reversed the decision of this Court, wherein we held that the community group contributions of property and money were not "contribution[s] to capital" included in the taxpayer's computation of its equity invested capital under former sec. 718 but that property acquired through the contributions could be depreciated as assets that the taxpayer purchased directly.

[*28] with the community groups:  (1) build or enlarge a factory and operate it for at least 10 years with a minimum payroll requirement, (2) enlarge a factory with a stipulated minimum addition to personnel for 10 years, and (3) construct an addition to an existing factory.  Id. at 586.  The Supreme Court noted that "[n]o restriction was imposed in any instance as to the use which petitioner might make of the property contributed or acquired with cash, or of the proceeds if the property should be disposed of, after expiration of the required period of operation."  Id. at 587.

The cash payments the taxpayer received from the several community groups

> were not earmarked for, or held intact and applied against, the plant acquisitions in the respective communities but were deposited in * * * [the taxpayer's] general bank account from which were paid general operating expenses and the cost of all assets acquired, including factory buildings and equipment in the towns involved.  The cash payments were debited to cash account on the assets side of * * * [the taxpayer's] ledger and were credited to earned surplus either upon receipt or after having first been assigned to contributed surplus. * * * [Id.]

Relying on Detroit Edison Co., the Internal Revenue Service (IRS) argued that the taxpayer could not depreciate the property contributed or the property acquired with the cash received from the community groups.  See Brown Shoe Co.

[*29] v. Commissioner, 339 U.S. at 584-585. The Supreme Court rejected the

IRS' position, concluding that

> the assets transferred to petitioner by the community groups
> represented "contributions to capital" within the meaning of
> § 113(a)(8)(B) and required no reduction in the depreciation basis of
> the properties acquired. The values which the taxpayer received were
> additions to "capital" as that term has commonly been understood in
> both business and accounting practice; conformably with this usage
> the pertinent Treasury Regulations have consistently recognized that
> contributions to capital may originate with persons having no
> proprietary interest in the business. That this interpretation is in
> harmony with broad congressional policy as to depreciation
> deductions was emphasized by the Third Circuit when considering
> the similar situation presented in Commissioner v. McKay Products
> Corp., supra, 178 F.2d at 643 * * * [Id. at 589-590; fn. refs. omitted.]

The Supreme Court distinguished Detroit Edison Co., stating:

> Since in this case there are neither customers nor payments for
> service, we may infer a different purpose in the transactions between
> petitioner and the community groups. The contributions to petitioner
> were provided by citizens of the respective communities who neither
> sought nor could have anticipated any direct service or recompense
> whatever, their only expectation being that such contributions might
> prove advantageous to the community at large. Under these
> circumstances the transfers manifested a definite purpose to enlarge
> the working capital of the company. [Id. at 591; fn. ref. omitted.]

In Teleserv. Co. of Wyo. Valley v. Commissioner, 27 T.C. 722 (1957),

aff'd, 254 F.2d 105 (3d Cir. 1958), a reviewed Opinion of this Court, we held that

payments received from customers to finance the construction of a television

antenna system were payment for services and not contributions to capital. The

[*30] taxpayer's customers were required to make this contribution to be eligible to receive television service, and the customer was required to make monthly payments to receive the signals. Id. at 725. We found that these facts made the case similar to Detroit Edison Co. We stated: "[T]here was nothing altruistic in the motive which prompted the petitioner's prospective customers to finance the television antenna system; they wanted television service and they were willing to pay for it." Id. at 730.

In contrast, in Federated Dep't Stores, Inc. v. Commissioner, 426 F.2d 417 (6th Cir. 1970), aff'g 51 T.C. 500 (1968), the Court of Appeals for the Sixth Circuit affirmed a decision of this Court holding that the contribution of land and cash to the taxpayer was a capital contribution under section 118. In that matter, a real estate developer induced the taxpayer to construct and operate a department store in a shopping center it was developing by conveying 10 acres in the development to the taxpayer and paying the taxpayer $200,000 per year for 10 years. Id. at 420.

In affirming the Tax Court, the Court of Appeals acknowledged that these inducements were made with the expectation that the department store would promote the real estate developer's financial interests. However, the Court of Appeals concluded that "this expectation was clearly of such a speculative nature

**[\*31]** that any benefit necessarily must be regarded as indirect. In all the cases relied upon by the government, the contributions had a reasonable nexus with the services which it was the business of the recipient corporation to provide. Such is not this case." Id. at 421. Thus "any benefit expected to be derived by Sharpstown [the real estate developer] was so intangible as not to warrant treating its contribution as a payment to taxpayer for future services." Id.; see also May Dep't Stores Co. v. Commissioner, T.C. Memo. 1974-253 (real estate developer's contribution of land to taxpayer in exchange for building and operating store for 25 years was a capital contribution), aff'd, 519 F.2d 1154 (8th Cir. 1975).

Three years later, the Supreme Court decided United States v. Chi., Burlington & Quincy R. Co., 412 U.S. 401 (1973), wherein several States required the taxpayer to construct numerous railroad safety improvements. The taxpayer entered into a series of contracts in which States would fund some or all of the costs incurred. The States were later reimbursed for these costs by the Federal Government. Id. at 402. The taxpayer sought to depreciate certain of the improvements paid for before June 22, 1954, from the public funds. See id. at 402-403.

The Supreme Court held that these subsidies were not contributions to capital within the context of former section 118(a)(8), and thus the taxpayer had a

**[\*32]** zero basis in the assets constructed with the subsidies. In reaching its decision, the Supreme Court focused on the intent of the donors. The Supreme Court reviewed its reasoning in <u>Detroit Edison Co.</u> and <u>Brown Shoe Co.</u> and those cases' differing holdings. "If at first glance <u>Detroit Edison</u> and <u>Brown Shoe</u> seem somewhat inconsistent, they may be reconciled, and indeed must be, on the ground that in <u>Detroit Edison</u>, the transferor intended no contribution to the transferee's capital, whereas in <u>Brown Shoe</u> the Transferor did have that intent." <u>Id.</u> at 412. Further, the Supreme Court stated:

> It seems fair to say that neither in <u>Detroit Edison</u> nor in <u>Brown Shoe</u> did the Court focus upon the use to which the assets transferred were applied, or upon the economic and business consequences for the transferee corporation. Instead, the Court stressed the intent or motive of the transferor and determined the tax character of the transaction by that intent or motive. Thus, the decisional distinction between <u>Detroit Edison</u> and <u>Brown Shoe</u> rested upon the nature of the benefit to the transferor, rather than to the transferee, and upon whether that benefit was direct or indirect, specific or general, certain or speculative. These factors, of course, are simply indicia of the transferor's intent or motive. [<u>Id.</u> at 411; fn. ref. omitted.]

The intent of the States providing funding for the safety improvements was not immediately obvious. To discern the donors' intent, the Supreme Court listed the following characteristics of a nonshareholder capital contribution:

> [1] It certainly must become a permanent part of the transferee's working capital structure. [2] It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the

**[*33]** transferor by the transferee. [3] It must be bargained for. [4] The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And [5] the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect. [Id. at 413.]

See S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 758-759 (1980), supplemented by 82 T.C. 122 (1984). This was not a new test, but rather was a distillation of characteristics examined in Detroit Edison Co. and Brown Shoe Co.

In rejecting the taxpayer's contention, the Supreme Court held that the third and fourth characteristics were not satisfied. With respect to the third characteristic there was no real bargaining between the taxpayer and the States; it was take-it-or-leave-it: "[E]xcept for the orders by state commissions and the governmental subsidies, the facilities most likely would not have been constructed at all". Chi., Burlington & Quincy R. Co., 412 U.S. at 414. With respect to the fourth characteristic, "[a]ny incremental economic benefit to CB&Q was marginal * * *. The facilities were peripheral to its business and did not materially contribute to the production of further income by the railroad. * * * [A]nd the need of the railroad for capital funds was not considered". Id. (fn. ref. omitted).

It should be emphasized that Chi., Burlington & Quincy R. Co., did not overrule Brown Shoe Co. or Detroit Edison Co. Moreover, the case did not establish a strict formula by which governmental assistance should be judged.

[*34] Rather, it established a way to infer the intent of the donor when the facts do not make it clear. As we observed in State Farm Road Corp. v. Commissioner, 65 T.C. 217, 226 (1975) (quoting Chi., Burlington & Quincy R. Co., 412 U.S. at 408):

> That the [Supreme] Court did not intend to lay a rigid analytical framework for problems arising under section 118 is clear from its statement that:
>
>> Whether the governmental subsidies qualified as income to the railroad is an issue not raised in this case, and we intimate no opinion with respect to it. * * *

State Farm Road Corp. turned on whether moneys received by the taxpayer from charges levied against prospective users to tie into a sewer system should be included in income. Except in limited circumstances, the sewer tie-in charges were nonrefundable, one-time charges for hooking up property to the sewer system and were deposited into the corporation's bank account. Id. at 221-222. We did not rely on the factors enunciated in Chi., Burlington & Quincy R. Co. Instead, after reviewing the legislative history of section 118, as well as the decisions in, among other cases, Cuba R.R. Co., Brown Shoe Co., Federated Dep't Stores, Teleserv. Co. of Wyo. Valley, and Detroit Edison Co., we found the facts to be substantially similar to those in Teleserv. Co. of Wyo. Valley and Detroit

**[\*35]** <u>Edison Co.</u>, holding that the payments were not contributions to capital. <u>Id.</u> at 230.

II.     <u>Application</u>

We now apply the aforementioned judicial principles to resolve the dispute before us. The evidence presented at trial shows the intent or motive of the State of New Jersey in making the payments to petitioner's affiliates. And the key to determining whether payments from a nonshareholder (here the State of New Jersey) are taxable to the recipient (here petitioner's affiliates) or nontaxable as a contribution to capital is the intent or motive of the nonshareholder donor.

It is undisputed that the EDA's purpose in making the BEIP grant to petitioner's affiliates was to induce them to establish their offices in a targeted area, i.e., an urban-aid municipality, not only to bring in new jobs, but also to revitalize the area. In the instant case we have clear evidence of the donor's intent, and we find that the EDA's intent and motivation for the BEIP grant was to provide a nontaxable contribution to capital. The statute enacting the BEIP stated that the purpose of the program was to develop New Jersey's economy and revitalize its cities by providing financial and technical assistance to, amongst other entities, businesses. Both witnesses from the EDA, Ms. Hassett and Ms. Butterfield, stated that their only interest in making such grants was to bring new

**[*36]** jobs to the State. The facts in this case fall squarely within the four corners of section 1.118-1, Income Tax Regs., and are strikingly similar to those of Brown Shoe Co. and McKay Prods. Corp., wherein the donor entities sought to induce the businesses in question to move to facilities within the donors' localities.

Respondent asserts that these cases are inapplicable because "Brown Shoe was not decided on the basis that it was a 'location inducement' case" and "[t]he McKay Products case was not a case involving the payment of grants in exchange for making withholding payments relating to the creation of new jobs, it involved a transfer of what was clearly a capital asset", i.e., the plant that was acquired for the taxpayer to occupy. Continuing, respondent asserts:

> In the instant case, unlike the cases Petitioner cites, the BEIP agreements do not provide that the Petitioner incur a specified amount of costs, or any cost at all, for capital assets or for any other type of asset. McKay Products and Brown Shoe involved the transfer of capital assets and a requirement to construct and enhance capital assets and did not require that the transferee pay a specified amount to the community groups based on wages paid to employees that were relocated from another state as a condition for the receipt of payments. * * *

Respondent misinterprets the facts of those cases. Instead of focusing on the intent of the donor, respondent focuses on the donee's construction of capital assets. In both Brown Shoe Co. and McKay Prods. Corp. the localities sought to induce the taxpayers in question to move to their respective localities. The

[*37] localities sought the economic benefits arising from the new jobs in the areas, just as New Jersey did in this matter. The taxpayer in Brown Shoe Co. was required to establish or expand facilities and then operate those facilities for a minimum period, generally 10 years. It was the operation of the business that generated the economic benefits the localities sought, not the construction of the facilities. As the taxpayer in Brown Shoe Co. was a manufacturing company, the hoped-for economic benefits required the construction or expansion of large buildings with heavy machinery. Had the taxpayer failed to meet the requirements of the agreement, it would have forfeited the aid it received. And once it had met its requirements, the taxpayer was free to do with the facilities as it wished.

The circumstances in McKay Prods. Corp. were similar. There, the donor purchased a factory building and offered to give the building to the taxpayer once the taxpayer moved its operations to Sayre and paid $5 million in payroll, which was estimated to take 10 years. If it did not meet these obligations, the taxpayer would not receive ownership of the factory. And the purpose of the donor was not to induce the taxpayer to build or buy a factory but rather to induce the taxpayer to move its business to the area and create jobs.

Respondent objects that petitioner's affiliates ultimately received $169,780,375 in aid via BEIP grants while expending only some $40 million in

[*38] moving to New Jersey.  Respondent implies that this disparity in aid versus the cost of establishing its office is excessive.  Respondent would not be alone in reaching this conclusion.  Ms. Butterfield testified that in the early years of the program, BEIP grants were too generous and the EDA subsequently changed its BEIP grant policies.

> [T]here were multiple changes to the program.  The program was very generous early on, in the early years.  And later--and--and there were some studies done by Rutgers (indiscernible) School of public policy to evaluate the level of awards being given to companies and some recommendations made to cap the awards based on certain factors. Those caps were put into place around 2004, but they were prospective as to the newer applications, not retroactive to those that had been approved.

But these facts do not affect our analysis.  Petitioner's affiliates were required to establish facilities in New Jersey and to operate the facilities for a minimum period with an agreed number of employees.  Had petitioner's affiliates failed to do so, they would have forfeited their State aid.

Respondent conflates "capital asset" such as a factory or machinery with "working capital".  As the Supreme Court observed, the phrase "contribution to capital" is not statutorily defined.  Chi., Burlington & Quincy R. Co., 412 U.S. at 412.  In Commissioner v. McKay Prods. Corp., 178 F.2d at 642, the Court of Appeals for the Third Circuit used the common definition of the phrase, stating it

[*39] meant "the value of that with which the enterprise carries on its activity. How much stake is in the game? What is the amount of money which is in the business?" The Supreme Court adopted this definition of working capital when citing McKay Prods. Corp. with approval in Brown Shoe Co. v. Commissioner, 339 U.S. at 590. And in Chi., Burlington & Quincy R. Co., 412 U.S. at 412-413, the Supreme Court cited Brown Shoe Co., stating that one characteristic of a contribution to a company's working capital was that the contributed funds were intended to benefit not only the transferors but the transferee as well, as the assets were put to immediate use by the taxpayer to generate additional income. Thus, we believe that the Supreme Court has adopted the common-sense definition of working capital used by the Court of Appeals for the Third Circuit.[14]

Petitioner's affiliates are financial services companies. They rely primarily on human capital, i.e., their employees, as well as the substantial cash reserves necessary to function as interdealer-brokers. Petitioner's affiliates have no need for massive facilities. Rather, an office with computers and telephones is sufficient for them to conduct business. Petitioner's affiliates made the cash

---

[14]Our own jurisprudence has defined working capital, for example, as "current assets less current liabilities (excluding current maturities of long-term debt and line of credit)". Estate of Gallagher v. Commissioner, T.C. Memo. 2011-148, slip. op at 34, supplemented by T.C. Memo. 2011-244.

**[\*40]** grants a part of their stake in the game by using the funds to acquire all of the stock of ICAP Holdings (USA), Inc., which enhanced the efficiency of petitioner's affiliates' businesses.

Respondent raises one more objection. Respondent asserts that "New Jersey received direct and substantial benefits from having BEIP applicants commit to creating jobs in New Jersey for 15 years by creating tax revenues that it would not otherwise have received". Thus, respondent asserts that petitioner's affiliates received the BEIP grant as a direct payment for a specific, quantifiable service, i.e., New Jersey bought tax revenue. Respondent's argument is not well taken. Initially, we note that the goal of the BEIP was to develop New Jersey's economy and revitalize its cities. Of course New Jersey benefited from the increased tax revenue of the new business brought to the State under the BEIP, but that is an indirect benefit as contemplated by the legislative history. As in Federated Dep't Stores, Inc. v. Commissioner, 426 F.2d at 420, there is no nexus between the services provided by petitioner's affiliates and the aid provided by the donor. Moreover, respondent's argument runs afoul of the holding in Brown Shoe Co., wherein programs that included a requirement to remain in the locality for a set time were found to be capital contributions.

**[*41]** III.    <u>Conclusion</u>

We find that the BEIP grant disbursements were contributions to the capital of petitioner's affiliates pursuant to section 118(a).  The circumstances surrounding the payments are substantially similar to those in <u>Brown Shoe Co.</u> and <u>McKay Prods. Corp.</u> and manifest the definite purpose of enlarging the working capital of petitioner's affiliates.

In the light of the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.