COMMISSIONER OF INTERNAL REVENUE v. McKAY PRODUCTS CORPORATION.

McKAY PRODUCTS CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

Nos. 9804, 9808.

United States Court of Appeals
Third Circuit.

Argued Nov. 8, 1949.

Decided Dec. 16, 1949.

William F. Malone, Baltimore, Md., John W. Cable, 3d, Baltimore, Md. (Karl F. Steinmann, Baltimore, Md., on the brief), for taxpayer.

Harry Marselli, Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen. and Ellis N. Slack, Sp. Asst. Atty Gen., on the brief), for Commissioner.

Before MARIS and GOODRICH, Circuit Judges, and CLARY, District Judge.

GOODRICH, Circuit Judge.

The controversies between the taxpayer and the Commissioner in these two appeals present three questions for our determination. Reduced to their simplest statement, the facts out of which the controversies arise are these:

People in the community of Sayre, Pennsylvania, sought during the depression to bring industries to town for the obvious purpose of increasing local payrolls and thus to promote general prosperity. To this end, a group of citizens organized Valley Industries, Inc., a Pennsylvania non-profit corporation, and subscribed a sum of money to it. A company which is in fact the taxpayer's predecessor, but will be referred to as the taxpayer,[1] moved to town and received a plant for the conduct of its business. Here are the questions which arise from these operative facts:

1. May the cost to Valley of the plant deeded to the taxpayer[2] become part of the latter's "equity invested capital" so that it may be taken account of in estimating the taxpayer's excess profits tax for a given period?

2. May the taxpayer include the cost of this plant to Valley in its figures for depreciation in subsequent tax years?

3. Some of the subscribers failed to pay. Did advances made by the taxpayer to Valley create debts which give rise to a bad debt deduction, and if a debt did exist, did it become worthless and when?

I.   The Excess Profits Tax Credit.

The Tax Court ruled adversely on the taxpayer's contention that the $310,000 cost of the property to Valley was includible in taxpayer's excess profits tax credit for the fiscal year ending July 31, 1942, computed according to the invested capital method pursuant to Section 718(a) (2) of the Internal Revenue Code, 26 U.S.C.A. § 718(a) (2). It was held that there could be no contribution to capital by a non-stockholder. The Court relied upon decisions by that Court, or its predecessor, the Board of Tax Appeals, which applied the statutes applicable to excess profits tax in World War I.[3] We think this ruling was incorrect.

---

1. An agreement to move to Sayre was executed by Valley Industries and Belle Knitting Corp., and it is the tax returns of Belle Knitting Corp. which concern us here. However, Belle's tax liabilities were assumed pursuant to a consolidation by Blue Swan Mills, Inc. The McKay Products Corp., which is both petitioner and respondent here, is successor by way of consolidation to Blue Swan Mills.

2. It was agreed that Valley would purchase and improve a then vacant factory building to be occupied by the taxpayer.

The property was to be deeded to the taxpayer after it had moved to Sayre and had paid out $5,000,000 in payroll, which it was estimated would take about ten years. This payroll condition was later waived, however, and the property transferred after the taxpayer had advanced money to Valley to enable the latter to meet its obligations.

3. War Revenue Act of 1917, § 207, 40 Stat. 306: "'invested capital' * * * means * * * (a) In the case of a corporation or partnership: (1) Actual

Here is the present statutory language. It is found in Section 718 and provides that "The equity invested capital * * * shall be the sum of * * * Property (other than money) previously paid in * * * for stock, or as paid-in surplus, or as a contribution to capital." Can there be a "contribution to capital" by a non-stockholder? If there can, the taxpayer is right and the Commissioner wrong.

The legislative history of the more recent statute casts little light upon the problem. We find only a statement by the Assistant Secretary of the Treasury, whose department played an important role in drafting the Act, explaining the reason for the shift from "value" in the earlier Acts to "cost" in the proposed statute.[4] Possibly his statement might bear the implication that no other change was made from the earlier statutes, but there certainly is no forthright declaration to this effect. Then there is a statement by a single member of the Senate Finance Committee, made in a minority report, which may or may not be taken to mean that contributions to capital can come only from stockholders for the purposes of the tax credit.[5] It is not clear from this statement whether the Senator is speaking of the draft of the bill which was eventually passed or concerning his own suggested amendment. This is all we have.

As the taxpayer points out, we find the words which are the critical words here used elsewhere in a way contrary to that which the Commissioner urges to us. The term "contribution to capital" was found in the Internal Revenue Code[6] and in the Regulations long before it appeared in Section 718. Section 29.113(a) (8)-1 of Regulations 111 makes it clear that a contribution to capital for the purpose of Section 113(a) (8) may come from any person. This has been true of the Regulation going as far back as 1935.[7] This use of the term must have been known to those acquainted with the tax law. Congress could have made "contribution to capital" mean one thing in Section 718 and another in Section 113(a) (8). But if such inconsistent meanings had been intended, we think there would appear, somewhere, some evidence to that effect. We have found none.

The taxpayer's position finds support from the Regulations referring to Section 718 itself. They provide that if property is acquired "by a corporation from a shareholder as paid-in surplus *or from any person as a contribution to capital,* then the basis shall be the same as it would be in the hands of the transferor * * * [emphasis added]."[8]

The Commissioner now suggests that the phrase "from any person" has obviously been employed in the Regulations so as to include contributions to capital by bondholders or holders of "some hybrid security," while excluding contributions from those who have no interest in the corporation. Perhaps; but why is the general language to be limited to that situation? Even if such a limitation was intended by the Regulations, it finds no basis whatever in the statute.

cash paid in, (2) the actual cash value of tangible property paid in other than cash, *for stock or shares* in such corporation or partnership * * *. [Emphasis added]."

Revenue Act of 1918, § 326, 40 Stat. 1092: "the term 'invested capital' for any year means * * * (2) Actual cash value of tangible property, other than cash, bona fide *paid in for stock* or shares * * *; (3) Paid-in or earned surplus and undivided profits * * *. [Emphasis added.]"

Revenue Act of 1921, § 326, 42 Stat. 274: relevant language same as 1918 Act.

4. Joint Hearings on Excess Profits Taxation before the Committee on Ways and

Means of the House of Representatives and the Committee on Finance of the Senate, 76th Cong., 3d Sess., p. 94 (1940).

5. Minority Report, Second Revenue Bill of 1940, Sen.Rep. No. 2114, Part 2, 76th Cong., 3d Sess., p. 12 (1940).

6. The term is found in the basis provisions of the Revenue Act of 1932, § 113 (a) (8), 47 Stat. 200, 26 U.S.C.A. § 113 (a) (8).

7. U. S. Treas. Reg. 86, Art. 113(a) (8)-1 (1935), pertaining to the Revenue Act of 1934.

8. U. S. Treas. Reg. 112, § 35.718-1 (1944).

The fact that Congress in Subchapter E gave the invested capital credit to corporate taxpayers establishes legislative awareness of the principle that more earnings should normally be expected to flow from an increase in working capital. The Commissioner and the Tax Court would say that this taxpayer is entitled to no greater earnings even though working assets committed to the enterprise were increased approximately twenty-five percent by Valley's contribution. Absent specific statutory language limiting the source of capital contributions for tax credit purposes, we think the contrary conclusion is correct and so hold, even though we are thus compelled to differ with the Eighth Circuit.[9]

The Commissioner urges that "capital" as used in Section 718 means the authorized capital stock of the taxpayer corporation, and cites Commissioner v. Brown Shoe Co., 8 Cir., 1949, 175 F.2d 305, petition for certiorari filed November 5, 1949, to sustain the argument that there can be a contribution to capital only to the extent that there is a deficit therein. It is agreed that this decision supports the Commissioner's view. We find ourselves, with due respect, in disagreement.

We do not think that such a highly technical construction (the insistence that anything above deficit cannot be a "contribution to capital") is consistent with the whole scheme of excess profits taxation contemplated by Subchapter E of the Code. We think the problems broader. Realizing that war activity would bring swollen profits to many corporations and seeking to avoid the creation of "war millionaires,"[10] Congress established a level beyond which profits were deemed excessive and therefore subject to the Subchapter E tax. To fix the basis for the application of the tax, there is in the code a provision for an "excess profits tax credit." The taxpayer is given two alternative methods of computing it. First, it may deduct from the net income, subject to the ordinary income tax, the average of earnings for a given base period. Alternatively, it may as did the taxpayer here, take as a credit an amount equal to eight percent of its invested capital. "It thus appears that by this method Congress intended, with minor exceptions not here relevant, to impose the excess profits tax on all annual net income in excess of 8% of a corporation's *working capital* * * *. [Emphasis added.]" Commissioner v. South Texas Lumber Co., 1948, 333 U.S. 496, 497–498, 68 S.Ct. 695, 697, 92 L.Ed. 831.

"Working capital" in common parlance means the value of that with which the enterprise carries on its activity. How much is its stake in the game? What is the amount of money which is in the business? When we find that, we allow that amount to be used as the basis to determine how much the business may earn before becoming subject to excess profits taxes. It seems to us unimportant who makes the contribution to this amount.

## II. Depreciation.

The Tax Court held that the taxpayer could not take as its basis for depreciation the $292,000 which was the cost of the factory building to Valley. This is the building which Valley conveyed to the taxpayer. The Internal Revenue Code provides that the basis of property received as a gift shall be that of the donor, Int. Rev.Code § 113(a) (2), 26 U.S.C.A. § 113 (a) (2), and that in the case of a contribution to capital, the transferee's basis shall

---

9. Mention should be made to show that it has not been overlooked, of our own decision in Carlisle Tire & Rubber Co. v. Commissioner, 3 Cir., 1948, 168 F.2d 816. There, we felt that the Dobson rule (Dobson v. Commissioner), 1931, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, required us to leave undisturbed the determination of the Tax Court that accounting practice would not permit inclusion in equity invested capital of debts forgiven by a non-stockholder creditor. The principle which guides us now is that of Section 1141 (a) of the Internal Revenue Code, 26 U.S.C.A. § 1141(a), and we are not constrained to approve what we think to be an incorrect interpretation of Section 718.

10. H. Rep. No. 2894, 76th Cong., 3d. Sess., pp. 1–2 (1940).

be the same as it would be in the hands of the transferor. Int.Rev.Code § 113(a) (8), 26 U.S.C.A. 113(a) (8).

Detroit Edison Co. v. Commissioner, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 was relied upon by the Tax Court for its conclusion. If it is in point it controls. But we think it is not our case. In the Detroit Edison case, the taxpayer charged consumers for the cost of extending electric current distribution facilities and claimed as a base for computing its depreciation the full cost of the installations. The Court held that funds so paid by consumers to the taxpayer utility were neither gifts nor contributions to capital. "It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. * * * The payments were to the customer the *price of the service*. [Emphasis added]". 319 U.S. at pages 102–103, 63 S.Ct. at page 904.

We think that what is significant is that the Detroit Edison Co. was in the business of selling electric power to the very persons whose payments it sought to depreciate, and that it was Detroit Edison's policy to deliver power to outlying areas only if the consumer bore the cost of the line extension. The matter is really summed up in the Court's statement that payments were part of the price of the service.

■ The Tax Court thought that the transfer of property from Valley to the taxpayer could not be treated as a "gift" because the transaction was one in which there was consideration sufficient to support a simple contract. It found that consideration in the manufacturing company's agreement to move to Sayre and conduct its operations there in return for the transfer of property to it by Valley. We agree that consideration was present. But we do not, as the Tax Court did, think that the presence of consideration precludes the treatment of the conveyance as a gift to the taxpayer.

The Tax Court took the last sentence of the Supreme Court's opinion in Helvering v. American Dental Co., 1943, 318 U.S. 322, 331, 63 S.Ct. 577, 582, 87 L.Ed. 785 to write into its requirements for gift treatment the concept "something * * * for nothing". Overlooked was that in the American Dental Co. case the taxpayer's debt was reduced as part of a transaction out of which a new lease was written and executed. Out of that can be spelled consideration in the contract sense.

■ The American Dental Co. decision does not of itself dispose of the problem posed by this case, for there the Supreme Court decided only that the forgiven debt was not taxable income to the debtor. It does not necessarily follow that the asset is depreciable. But the assets received from Valley are being used by the taxpayer in the operation of its business. They will in time wear out, and if The McKay Products Corporation is to continue in business, the physical plant must eventually be replaced. Looking as they do toward business continuity, the Internal Revenue Code's depreciation provisions—and especially those which provide for a substituted rather than a cost basis—would seem to envision allowance of a depreciation deduction in situations like this. We think that this transfer entitles the taxpayer to its donor's basis under Section 113(a) (2), and furthermore, for the reasons given in the discussion above of the excess profits tax problem, that the same conclusion follows under Section 113(a) (8). In this, we differ with the Fourth [11] and Eighth [12] Circuits, but our own decision in Commissioner v. Revere Land Co., 3 Cir., 1948, 169 F.2d 469, certiorari denied 335 U.S. 853, 69 S.Ct. 82, is not to the contrary. There, the taxpayer lessee received a cash grant from the owner of the real estate and used the funds to defray construction costs of an office building. In return, it

11. Commissioner v. Arundel-Brooks Concrete Corp., 4 Cir., 1945, 152 F.2d 225, 162 A.L.R. 1200. Here the court thought its result required by the Detroit Edison decision.

12. Commissioner v. Brown Shoe Co., 8 Cir., 1949, 175 F.2d 305; C. L. Downey Co. v. Commissioner, 8 Cir., 1949, 172 F. 2d 810. The latter case deals with "borrowed invested capital."

took assignment of a lease which assured eventual return of the money to the owner of the land and issued preferred stock in the amount of the advance to a third corporation. It was held that the taxpayer could include the full cost of the building in his depreciation account.

### III. The Bad Debt Deduction.

As to this, some additional facts should be stated. Once it had been agreed that taxpayer's predecessor, Belle, was to move to Sayre, Valley staged a drive to raise funds for the purchase and improvement of the then vacant factory building which was to house the new industry when it came. In addition to about $60,000 in cash, Valley obtained from 1,200 to 1,500 people pledges in the amount of $250 each. Each pledge provided that if the promisor should be employed by Belle, the latter would have the right to deduct ten percent of the promisor's wages until the full sum was paid. Valley purchased the building subject to a $100,000 purchase money mortgage. After improvements had been made, Belle moved in and began manufacturing operations.

Valley found that money was not coming in fast enough on the pledges, and in order to meet its obligations, borrowed money from Belle. In return, Valley waived the $5,000,000 payroll agreement in the contract and title to the building was forthwith transferred to Belle. Later, as a prerequisite to obtaining a Reconstruction Finance Corporation loan, Belle took an assignment of the pledges from Valley. Belle then paid the balance due on the real estate mortgage, with Valley agreeing that Belle was to be reimbursed out of the payroll deductions.

In 1939, the Administrator of the Wage and Hour Division of the United States Department of Labor successfully instituted proceedings to halt payroll deductions as authorized by the pledges, on the ground that the deductions were in violation of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., insofar as the net wage was below the prescribed minimum of thirty cents an hour. Valley took no further steps to enforce the pledges, and

for the fiscal year ending July 31, 1940, took a bad debt deduction of $130,607.42 under Section 23(k) of the Internal Revenue Code, 26 U.S.C.A. § 23(k).

This deduction was contested by the Commissioner, but upheld by the Tax Court. The Commissioner in his appeal contends that the advances did not give rise to debts but were the cost of acquiring property. Further, that even if debts did exist, their worthlessness was not established.

We cannot improve upon the handling of this question by the Tax Court. It found, and its findings in this respect are supported by substantial evidence, that Valley was obligated to pay the purchase price of the property transferred to Belle, and that "it was understood by both corporations that the advancements were loans which would be repaid." 9 T.C. at 1089. We agree with the Tax Court's conclusion that at the time the advances were made, both parties had every reason to believe that the outstanding pledges would be fulfilled, thus permitting Valley to satisfy its obligations. Moreover, when the pledges were assigned to Belle, Valley expressly acknowledged a then existing indebtedness to Belle and, in addition, liability for any future payments by Belle in reduction of the mortgage.

This Court has already held that a debt is defined for federal tax purposes as "an unconditional and legally enforceable obligation for the payment of money." Autenreith v. Commissioner, 3 Cir., 1940, 115 F.2d 856, 858; Commissioner v. Park, 3 Cir., 1940, 113 F.2d 352. That is what we find here. It cannot be said that the advances were merely the cost of acquiring property, for Belle had at all times either a promise by Valley to convey the land and buildings free of all encumbrances, or title. True, there was a $100,000 mortgage against the factory, but Valley was contractually obligated to satisfy it.

On the question of worthlessness, we are satisfied that a sufficient showing has been made. At any rate, there is substantial evidence to support the finding of the Tax Court on this question. The

probability seems remote that the balance due on the pledges could have been collected from workers whose earnings were barely above the minimum of thirty cents an hour. "Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purpose of the deduction." U.S.Treas.Reg. 111, § 29.23 (k)-1.

The decision of the Tax Court will be reversed and the cause remanded for proceedings not inconsistent with this opinion.