PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 19-2603

COMMISSIONER OF INTERNAL REVENUE,
Appellant

v.

BROKERTEC HOLDINGS, INC.
F.K.A.
ICAP US INVESTMENT PARTNERSHIP

Appeal from the Decision of the
United States Tax Court
Docket No. 17-03573
Tax Court Judge: Honorable Julian I. Jacobs

Argued April 23, 2020

Before: AMBRO, SHWARTZ, and BIBAS, Circuit Judges

(Opinion filed: July 28, 2020)

Michael J. Desmond
Holly Porter
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, DC 20224

Richard E. Zuckerman
   Principal Deputy Assistant Attorney General
Travis A. Greaves
   Deputy Assistant Attorney General
Judith A. Hagley (Argued)
Gilbert S. Rothenberg
Francesca Ugolini
United States Department of Justice, Tax Division
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC 20044

       Counsel for Appellant

Theresa M. Abeny
David B. Blair (Argued)
Robert L. Willmore
Crowell & Moring
101 Pennsylvania Avenue, N.W.
Washington, DC 20004

       Counsel for Appellee

AMBRO, Circuit Judge

States often provide economic incentives, such as tax breaks or grants, to businesses willing to relocate, with the understanding that these businesses will create new jobs and otherwise improve the state's economy. This tax case involves one such incentive program, under which the State of New Jersey provided cash grants, without any restrictions on how that cash could be used, to companies willing to relocate or expand there and create a certain number of high-paying jobs in the State.

At issue is whether those grants are "contribution[s] to the capital of the [company]" under Section 118 of the Internal Revenue Code, 26 U.S.C. § 118(a), as it existed at the relevant time, such that they are excluded from the company's taxable income. The Tax Court held that they are, concluding that $56 million in cash grants to a financial services company, Appellee BrokerTec Holdings, Inc. ("BrokerTec"), were contributions to its capital, not taxable income. We reverse and hold that—because the State did not restrict how BrokerTec could use the cash, and because the grants were calculated based on the amount of income tax revenue that the new jobs would generate—the grants were taxable income, not contributions to capital.[1]

---

[1] As we note below, Congress has since amended § 118 to exclude from the definition of a contribution to capital contributions by governmental entities.

I.

The relevant facts—as found by the Tax Court following a bench trial—are undisputed. In 1996, the State of New Jersey created the Business Employment Incentive Program (the "Incentive Program") to "grow New Jersey's economy and revitalize its cities through providing financial . . . assistance to businesses," specifically cash grants for companies willing to relocate or expand to New Jersey. *BrokerTec Holdings, Inc. v. Comm'r*, No. 3573-17, 2019 WL 1545724, at *3 (T.C. Apr. 9, 2019). For a company to be eligible for Incentive Program grants, three conditions must be satisfied: (1) the relocation or expansion would create a net increase in employment in the State; (2) the project would be economically sound and of benefit to the people of New Jersey by increasing employment and strengthening the State's economy; and (3) the receipt of the grants would be material to the company's decision to undertake the relocation or expansion. *See* N.J. Stat. Ann. § 34:1B-126.

Beyond these criteria, the Incentive Program was discretionary. A company seeking grants could apply to New Jersey's Economic Development Authority (the "Development Authority"), which administered the Incentive Program. It would evaluate applications using various criteria, including the number, type, and duration of new jobs to be created; the type of contribution the business could make to the long-term growth of the State's economy; the amount of other financial assistance the business would receive from the State; and the total amount of money the company would invest in the project.

A company receiving the grants would be required to maintain a minimum number of employees and remain at the new location for a certain time period. But no restrictions were placed on how the company could use the grant money. The

4

amount the company would receive was a set percentage of state income taxes withheld from the wages of the company's employees at the new location. That percentage varied from 30% to 80% of tax withholdings. Larger grants would be provided to businesses creating jobs in certain municipalities in particular need of investment as well as businesses in certain targeted industries. The grants would not be paid until the recipient had completed the project and begun to pay wages, and until it could be confirmed that the amount of state income tax withheld from those wages had met or exceeded the amount of the proposed grant. This ensured that the grants would generate more revenue for the State than they cost.

The grant recipients here are two subsidiaries of BrokerTec: Garban Intercapital North America, Inc. ("Garban") and First Brokers Holdings, Inc. ("First Brokers"). Garban's offices in the World Trade Center were destroyed, and First Brokers' nearby offices were rendered uninhabitable, in the attacks of September 11, 2001. Seeking new office space, BrokerTec learned about the Incentive Program and, soon after the attacks, submitted applications to the Development Authority to relocate both Garban and First Brokers across the Hudson River to New Jersey.

BrokerTec certified it would employ a combined 720 full-time workers at its relocated office spaces. It also noted that it would make more than $47 million in improvements to the raw office space it was leasing, as well as acquire more than $25 million in technology, furniture, and other equipment. But it was not required under the terms of the Incentive Program to make those expenditures to receive grants. What was required was that it create a minimum number of jobs, and hence a minimum amount of income tax revenue, for the State.

In 2002, BrokerTec's applications were approved, and both Garban and First Brokers entered into agreements with

5

the Development Authority for a 10-year period of Incentive Program grants. Garban's grants would amount to 80% of its employees' state income tax withholdings, and First Brokers' would amount to 70%, as it created fewer jobs than Garban.

The State began to make grant payments in 2004, after BrokerTec had started to pay employees. Over the next decade, Garban received over $147 million, and First Brokers received $22 million, for a total of approximately $170 million. It used those funds to purchase stock in a wholly owned subsidiary, ICAP Holdings (USA), Inc., as "part of a series of transactions designed to expand [its] business into other trading markets." *BrokerTec Holdings, Inc.*, 2019 WL 1545724, at *6.

During the four tax years at issue here, 2010 to 2013, BrokerTec's tax returns (consolidated with the returns for its subsidiaries, Garban and First Brokers) excluded approximately $56 million in Incentive Program grant payments as non-taxable, non-shareholder contributions to capital under 26 U.S.C. § 118. The Commissioner of Internal Revenue concluded that the grants were taxable income and, accordingly, issued BrokerTec a deficiency notice for the difference in taxes. It petitioned the Tax Court for review.

The Tax Court held a bench trial at which it heard from witnesses—including Development Authority staff—and considered the parties' stipulations. Following the trial, the Court issued an opinion agreeing with BrokerTec that the grants were capital contributions and thereby excluded from taxable income. *See BrokerTec Holdings, Inc.*, 2019 WL 1545724, at *7–15. The Court reasoned that, because New Jersey provided the Incentive Program grants to BrokerTec as an inducement for it to relocate its business there, they "fall squarely within the four corners" of a Treasury Regulation interpreting § 118. *Id.* at *13. That Regulation provides, as an

6

example of a contribution to capital, "the value of land or other property contributed to a corporation by a governmental unit or by a civic group *for the purpose of inducing the corporation to locate its business in a particular community*." 26 C.F.R. § 1.118-1 (emphasis added). The Court added that, consistent with this regulation, "[t]he circumstances surrounding the [Incentive Program grant] payments [were] substantially similar to those" in *Brown Shoe Co. v. Commissioner*, 339 U.S. 583 (1950), and *Commissioner v. McKay Products Corp.*, 178 F.2d 639 (3d Cir. 1949), both of which involved relocation incentives provided to businesses by local governments or community groups. *BrokerTec Holdings*, 2019 WL 1545724, at *15. Thus, the Court concluded, the Incentive Program grants "manifest the definite purpose of enlarging the working capital of [BrokerTec]" and were therefore contributions to capital, not taxable income. *Id.* The Commissioner appeals to us.

II.[2]

We first consider the appropriate standard of review. BrokerTec contends that the Tax Court's conclusion that New Jersey intended to make a contribution to BrokerTec's capital is a factual finding, and hence subject to review under the deferential clear-error standard. The Commissioner responds that, "to the extent that the Tax Court found as a factual matter that New Jersey intended to make a capital contribution, that conclusory determination is nevertheless subject to plenary review because the court focused on the wrong facts and erroneously viewed the law." Reply Br. 4.

---

[2] The Tax Court had jurisdiction under 26 U.S.C. §§ 6213(a), 6214, and 7442. We have jurisdiction to review the Tax Court's decision under 26 U.S.C. § 7482(a)(1).

7

The Tax Court's conclusions as to motive and intent are generally factual findings, subject to clear-error review. *See Bedrosian v. United States*, 912 F.3d 144, 151 (3d Cir. 2018) ("[W]e have held that the Tax Court's determination of willfulness in tax matters is reviewed for clear error." (citation omitted)); *Smith v. Comm'r*, 305 F.2d 778, 780 (3d Cir. 1962) (reviewing for clear error the Tax Court's conclusion that a payment was intended as a gift, turning on a finding as to the transferor's motive). But "[e]ven when we review a trial court's primarily factual determination under a deferential standard of review, we nonetheless have a duty to 'correct any legal error infecting [the] decision.'" *Bedrosian*, 912 F.3d at 152 (alteration in original) (quoting *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt., LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 968 (2018)); *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 501 (1984) (holding that the clear-error standard "does not inhibit an appellate court's power to correct errors of law, including . . . a finding of fact that is predicated on a misunderstanding of the governing rule of law").

For the reasons set out below, we agree with the Commissioner that the Tax Court's finding was predicated on a misunderstanding of Internal Revenue Code § 118 as well as the Treasury Regulation and cases interpreting the statutory provision. Specifically, the Tax Court appears to have understood these authorities to hold that, where a government provides a company cash as a relocation inducement, its intent to contribute to the company's capital is shown—even where the government places no restrictions on how the cash can be used nor calculates the amount of cash provided on the basis of the company's investment in capital assets. In doing so, the Tax Court misperceived the law.

8

III.

The Internal Revenue Code sets out a broad definition of "gross income," providing that, except where excluded by another provision, it "means all income from whatever source derived." 26 U.S.C. § 61(a). In light of this broad definition, the Supreme Court has held that "exclusions from income must be narrowly construed." *Comm'r v. Schleier*, 515 U.S. 323, 328 (1995) (citation omitted).

The exclusion at issue here, 26 U.S.C. § 118, provided at the relevant time that, where the taxpayer is a corporation, "gross income does not include any contribution to the capital of the [corporation]." § 118(a). The section does not define "contribution to . . . capital," but, as the Treasury Regulation interpreting § 118 makes clear, it includes not only contributions from the corporation's shareholders, but from others as well, including government entities. *See* 26 C.F.R. § 1.118-1 (noting that "Section 118 also applies to contributions to capital made by persons other than shareholders," including those by "a governmental unit or a civic group").[3] In determining whether a transfer is income or a contribution to capital, we consider "the intent or motive of the *transferor*," not "the use to which the assets transferred were applied, [n]or . . . the economic and business

_____

[3] In 2017, however, Congress amended § 118 to exclude from the definition of "contribution to . . . capital . . . any contribution by any governmental entity . . . (other than a contribution made by a shareholder as such)." 26 U.S.C. § 118(b)(2); Tax Cuts & Jobs Act, Pub. L. No. 115-97, § 13312, 131 Stat. 2054, 2132–33 (2017). But because the tax years at issue here precede the passage of this legislation, it does not apply. The Treasury Regulation, 26 C.F.R. § 1.118-1, has not yet been amended to reflect this change to the Code.

consequences for the *transferee* corporation." *United States v. Chi., Burlington & Quincy R.R. Co.* ("*CB&Q*"), 412 U.S. 401, 411 (1973) (emphases added).

About this much the parties agree. They disagree, however, as to what circumstances indicate a transferor's intent to make a contribution to capital. As noted above, the Tax Court relied—as BrokerTec does here—on the Treasury Regulation, which sets out examples of when a transfer is a contribution to capital and when it is not:

> For example, the [contribution-to-capital] exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group *for the purpose of inducing the corporation to locate its business in a particular community*, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production.

26 C.F.R. § 1.118-1 (emphasis added).

As noted above, the Tax Court concluded that New Jersey's Incentive Program grants "fall squarely within the four corners" of the Regulation because the grants were made to induce BrokerTec to relocate there. *BrokerTec Holdings, Inc.*, 2019 WL 1545724, at *13. The Commissioner argues that this oversimplifies the analysis and that, while a relocation inducement provided by the state may be a contribution to capital, it is not necessarily so. He maintains that even relocation-inducement payments must meet two tests: (1) the

10

payments must, in some way, be restricted to use as *capital*, and not be available for the payment of operational expenses (like wages) or dividends; and (2) the payments may not be direct compensation for services rendered by the company. The Commissioner derives these two tests, respectively, from the first two "characteristics" of a non-shareholder contribution to capital set out by the Supreme Court in *CB&Q*: (1) the contribution "certainly must become a permanent part of the transferee's working capital structure"; and (2) "[i]t may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee." 412 U.S. at 413.[4]

The Commissioner maintains the Incentive Program grants fail both tests. As to the first test, the payments were

---

[4] The Supreme Court identified three other "characteristics" of a non-shareholder contribution to capital under § 118: (3) "[i]t must be bargained for;" (4) "[t]he asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value;" and (5) "the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect." *CB&Q*, 412 U.S. at 413.

While *CB&Q* refers to these as "characteristics," the mandatory language in the first four—"must" and "may not"—indicates that these are requirements for a transfer to be a contribution to capital. *See AT&T, Inc. v. United States*, 629 F.3d 505, 513 (5th Cir. 2011) (holding that "for a court to hold that a transfer was a capital contribution, each of the first four, and ordinarily the fifth, characteristics [from *CB&Q*] must . . . be satisfied").

11

unrestricted and could be used for *any* purpose. While they could be used to acquire a capital asset, they could also be used to pay operating expenses like wages, or even to pay dividends. Moreover, the amount of the grants was not calculated based on the amount of capital investments BrokerTec agreed to make; rather they were calculated based on the amount of wages it paid to its employees. As for the second test, the Commissioner argues that the Incentive Program grants were compensation for services BrokerTec provided to New Jersey—namely, additional income tax revenue generated by its employees.

BrokerTec responds that the Commissioner's tests misstate the law. The first test, it contends, would require that a grant's use be limited to the acquisition of "hard assets" such as machinery or other property, a limitation neither the Treasury Regulation nor the cases support. BrokerTec Br. 26, 46. As to the second test, BrokerTec maintains that, where a government provides grants to encourage economic development and the benefits that come with new jobs and increased tax revenue, the benefits are indirect and speculative, such that they cannot be considered compensation for services rendered.

We agree with the Commissioner's first argument, and thus need not consider the second.[5] To be a non-shareholder contribution to capital, even a relocation inducement "must become a permanent part of the transferee's working capital

---

[5] The Commissioner offers two other arguments in support of reversal that we also need not reach here: (1) that the fourth and fifth *CB&Q* characteristics were not present, and (2) that BrokerTec is barred from contesting the Tax Court's conclusion regarding New Jersey's intent by the "duty of consistency," Reply Br. 21–22.

structure." *CB&Q*, 412 U.S. at 413. And, as discussed in greater detail below, a review of the Supreme Court's and our cases preceding *CB&Q* indicates this is not so where, as here, cash grants were provided without any restrictions on their use.

IV.

The Supreme Court first considered whether a government payment to a corporation was a non-shareholder contribution to capital in *Edwards v. Cuba Railroad Company*, 268 U.S. 628 (1925). There, the Cuban government paid a railroad company to construct and operate a railroad line in Cuba—specifically, $6,000 per kilometer, which amounted to about one-third of the cost of construction. *Id.* at 629–30. In addition, the government also provided the company with buildings and equipment. *Id.* at 630. The Commissioner argued that the cash payments were income. *Id.* at 632. The Supreme Court rejected this argument, concluding that the cash payments, along with the buildings and equipment, were contributions to the railroad's capital. *See id.* at 633. As it explained, that "[t]he subsidy payments were proportionate to mileage completed . . . indicat[ed] a purpose to reimburse [the company] for capital expenditures." *Id.* at 632. The Court added that nothing in the agreements between the railroad and the government "indicate[d] that the money subsidies were to be used for the payment of dividends, interest or anything else properly chargeable to or payable out of earnings or income." *Id.* at 633.

The Commissioner contends that *Edwards* supports his position that, to constitute contributions to capital, government payments must, in some way, be restricted to use as capital and cannot be available for use in paying dividends or operating expenses. We agree. While the Cuban government did not explicitly restrict the use of the cash payments, the Court specifically noted that the payments amounted only to "one-

13

third of the cost of the railroad," *id.* at 630, indicating that they were a "reimburs[ment]" for capital expenditures, *id.* at 632, rather than "money subsidies . . . to be used for the payment of dividends, interest or anything else properly chargeable to or payable out of earnings or income," *id.* at 632–33.

Seven years later, in *Texas & Pacific Railway Company v. United States*, 286 U.S. 285 (1932), the Supreme Court had nearly the opposite facts as those in *Edwards*. The case involved payments made to a railroad company by the federal Government, under a statute that placed the railroad under government control during wartime. *Id.* at 287–88. The statute "guarantee[d] a 'minimum operating income' [to the railroad company] for six months after relinquishment of federal control." *Id.* at 288 (citation omitted). In contrast to the payments by the Cuban government in *Edwards*, the Court explained, the federal Government's payments "were to be measured by a deficiency in [the railroad company's] operating income," and "might be used [by the railroad company] for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within the corporate authority, just as any other operating revenue might be applied." *Id.* at 290. Thus, the Court concluded, the payments were not contributions to capital but income to the railroad. *See id.*

Read together, *Texas & Pacific Railway* and *Edwards* suggest that unrestricted government payments to a company reveal an intent to provide the company additional income rather than a contribution to the company's capital. Plus, calculating payments based on the company's income, rather than on the amount of some capital investment made by the

14

company, further indicates an intent to provide income rather than a contribution to capital.

In 1943, the Supreme Court first took up a case illustrating the second characteristic of a contribution to capital later described in *CB&Q*—that it not be compensation for services rendered. *See Detroit Edison Co. v. Comm'r*, 319 U.S. 98, 99–103 (1943). It involved an electric utility company that would extend electric lines to certain areas only where the customers in those areas paid the costs for the extension. *Id.* at 99. Funds that a customer paid for this purpose would go into the utility company's general fund but would not be earmarked specifically for construction of the lines. *Id.* at 100. The Court rejected the utility's argument that the customers' payments were non-shareholder contributions to capital, explaining that, because "[t]he payments were to the customer the price of service," they were income to the utility company. *Id.* at 103.

Neither *Edwards*, *Texas & Pacific Railway*, nor *Detroit Edison* involved payments made to induce a company to relocate—like the grants at issue here. But even before the Supreme Court had occasion to apply those principles in such a case, we did so in *Commissioner v. McKay Products Corp.*, 178 F.2d 639 (3d Cir. 1949). There townspeople formed a nonprofit company and raised funds to bring an industry to the town. *Id.* at 640. The nonprofit purchased a factory building and offered it for use by a company, McKay Products, agreeing to deed the factory over once it had paid out $5 million in wages. *Id.* at 640 n.2. McKay Products argued the factory was a contribution to its capital, rather than income, and we agreed, distinguishing *Detroit Edison* as a case in which the "payments were part of the price of the service." *Id.* at 643.

Less than a year after we decided *McKay Products*, the Supreme Court took up the same issue in *Brown Shoe Co. v. Commissioner*, 339 U.S. 583 (1950). Community groups in

15

twelve different towns sought to have Brown Shoe establish a factory, or enlarge an existing one, within the community. *Id.* at 586. And to that end, the community groups provided inducements to Brown Shoe, including both land and cash for the production or enlargement of a factory. *Id.* The Court cited *McKay Products* approvingly, and distinguished *Detroit Edison* on the same basis, explaining that the communities had not paid Brown Shoe for services rendered. *Id.* at 589–91. Rather, they "could [not] have anticipated any direct service or recompense whatever, their only expectation being that [their] contributions might prove advantageous to the community at large." *Id.* at 591. "Under these circumstances," the Court concluded, "the transfers manifested a definite purpose to enlarge the working capital of the company." *Id.*

In our case, the Tax Court concluded—and BrokerTec argues—that *McKay Products* and *Brown Shoe* support the position that the Incentive Program grants were contributions to BrokerTec's capital because they were relocation inducements. *See BrokerTec Holdings, Inc.*, 2019 WL 1545724, at *13–14 (concluding that the facts of *McKay Products* and *Brown Shoe* are "strikingly similar" in that in both "the localities sought to induce the taxpayers in question to move to their respective localities"); BrokerTec Br. 25–26 ("*Brown Shoe* teaches . . . [that] location inducement grants like these are contributions to capital."). But, importantly, neither *McKay Products* nor *Brown Shoe* involved cash grants that were entirely unrestricted in use and calculated on the basis of wages paid rather than on the basis of the amount spent to relocate. *McKay Products* involved the contribution of a factory, rather than cash, and thus the contribution was of a capital asset. *See* 178 F.2d at 642. And while *Brown Shoe* involved the contribution of both land and cash without any explicit restriction on its use, the Court specifically noted that "[i]n every instance the cash received by [the company] from a community group was less than the amount expended by it

16

for the acquisition or construction of the local factory building and equipment." 339 U.S. at 587. We agree with the Commissioner that this was an *implicit* restriction: the company in *Brown Shoe* "was effectively required to invest the funds (or a like amount) in its permanent working capital structure." Comm'r's Br. 31.

In sum, the cases from which the first *CB&Q* characteristic was distilled—*Edwards*, *Texas & Pacific Railway*, *McKay Products*, and *Brown Shoe*—support the Commissioner's position that unrestricted cash grants, calculated on the basis of the recipient's payment of wages, are not contributions to capital but rather are supplements to the company's income.

V.

Our reading of these cases is also consistent with more recent decisions from two of our sister circuits. *See AT&T, Inc. v. United States*, 629 F.3d 505 (5th Cir. 2011); *United States v. Coastal Utils., Inc.*, 483 F. Supp. 2d 1232 (S.D. Ga. 2007), *aff'd*, 514 F.3d 1184 (11th Cir. 2008) (per curiam adopting the district court's opinion in full). At issue in both cases were payments made by the federal and state governments to telephone companies that provided service to certain high-cost and low-income users in an effort to enable the companies to provide services to those users while remaining competitive in the market. *AT&T*, 629 F.3d at 507; *Coastal Utils.*, 483 F. Supp. 2d at 1234. In both cases the Court concluded that the government payments were not contributions to the company's capital but taxable income. *AT&T*, 629 F.3d at 520; *Coastal Utils.*, 483 F. Supp. 2d at 1250–51. In so holding, they reasoned that the government payments were not restricted to use as capital, and they were calculated based on operational expenses. *See AT&T*, 629 F.3d at 517 (explaining that, "like the payments at issue in *Texas & Pacific Railway*, the

17

[government payments at issue] can be used for the payment of a wide variety of expenses," and "[t]herefore, the . . . payments are not excludable from . . . income as nonshareholder contributions to capital under 26 U.S.C. § 118"); *Coastal Utilities, Inc.*, 483 F. Supp. 2d at 1243 ("Because the amount of payments takes into consideration a wide range of operational expenses, the payments are not solely for capital purposes.").

BrokerTec argues that *Coastal Utilities* and *AT&T* are distinguishable because neither case involved government payments to induce a company to relocate, like the Incentive Program grants. We disagree. They illustrate that, for government payments to "become a permanent part of the transferee's working capital structure," as required by *CB&Q*, 412 U.S. at 413, they must in some way be designated for use as capital—whether by an explicit restriction on the use of the funds, or by tying the amount of funds to the amount of a capital investment required of the company. Otherwise, the government payments are merely intended as supplements to income. That rule applies regardless whether the payments were made to encourage the recipient to provide service to additional customers, as in *AT&T* and *Coastal Utilities*, or to induce the recipient to relocate, as in *McKay Products, Brown Shoe*, and this case. The Tax Court failed to appreciate that this rule applies even in the case of relocation-incentive payments.

VI.

Having concluded that the Tax Court's decision was based on a misperception of the law, we must "decide whether to remand the case to that court for clarification of the basis of its determination or, alternatively, whether to decide the primarily factual issue ourselves." *Bedrosian*, 912 F.3d at 152. "In general, the proper course will be remand unless the record

18

permits only one resolution of the factual issue." *Id.* (internal quotation marks omitted).

When viewed in light of the law as set out above, the record here permits only one resolution: New Jersey's Incentive Program grants to BrokerTec were intended as a supplement to its income rather than as a contribution to its capital. It is undisputed that New Jersey placed no restriction on how the Incentive Program grants could be used: they could be used to make capital improvements, but they could also be used for operational expenses such as paying wages, or even paying dividends to shareholders. And it also undisputed that the amount of the grants was not tied to the amount of capital improvements BrokerTec would make. Indeed, while BrokerTec indicated in its Incentive Program applications that it would make $72 million in capital investments (in the form of improvements to office space, and the acquisition of technology and furniture), the total amount of Incentive Program grants was based on a percentage of income tax withholdings generated by BrokerTec's employees and totaled approximately $170 million. In light of these facts, BrokerTec cannot show that New Jersey intended the Incentive Program payments to "become a permanent part of [BrokerTec's] working capital structure." *CB&Q*, 412 U.S. at 413.

\* \* \* \* \*

For the reasons set out above, we reverse the ruling of the Tax Court.

19